Joy EVANS, et al., Plaintiffs,

United States of America,
Plaintiff–Intervenor,

v.

Anthony A. WILLIAMS,
et al., Defendants.

CIV. A. No. 76–293 SSH.

United States District Court,
District of Columbia.

March 30, 2001.

Joseph B. Tulman, University of District of Columbia, David A. Clarke School of Law, Kelly Bagby, University Legal Services, Inc., Washington, DC, for Plaintiffs or Petitioners.

Richard J. Farano, Senior Trial Attorney, U.S. Department of Justice, Civil Rights Division, Special Litigation Section, Washington, DC, for Plaintiff–Intervenor.

Maria C. Amato, Senior Counsel, Office of Corporation Counsel, Government of District of Columbia, Task Force, Major Equity Litigation, Washington, DC, for Defendants or Respondents.

Margaret G. Farrell, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Special Master.

## OPINION AND ORDER

HARRIS, District Judge.

On February 10, 1999, the Court issued an Opinion and Order by which it granted the motions of plaintiffs and the United States to find defendants in contempt for their failure to comply with certain earlier Orders in this case. The Court imposed contempt fines of $5,096,340.00 against defendants. In addition, the Court ordered the Special Master, in cooperation and conjunction with the parties, if possible, to develop a plan for the conclusion of this action which would address the disposition of the fines to have been paid by defendants and make suggestions for post-litigation mechanisms to ensure the protection of the plaintiff class' continuing interests in adequate habilitation. *Evans v. Williams,* 35 F.Supp.2d 88, 97 (D.D.C.1999).

Among other things, the plan was to address:

(1) A summary and articulation of the goals of this lawsuit;

(2) The status of compliance with various Court Orders;

(3) The quality assurance methods to be developed and implemented by defendants to monitor the performance of public and private providers of service;

(4) The standards, including outcomes standards to be developed and implemented by defendants, that should be used to determine defendants' continuing compliance with Court-ordered requirements, and the way in which compliance with such standards should be measured;

(5) The degree of compliance that should be required with respect to each of the standards recommended;

(6) The steps necessary to establish permanent, objective, efficient, and effective post-termination monitoring of the programs serving consumers by independent entities; and

(7) The steps necessary to coordinate existing mechanisms and to develop needed mechanisms for the advocacy of the interests of consumers on an individual and community-wide basis.

Defendants appealed the Court's imposition of contempt fines. On March 31, 2000, the Court of Appeals reversed this Court's decision on the majority of the contempt fines. *Evans. v. Williams*, 206 F.3d 1292 (D.C.Cir.2000).

Pursuant to the Court's February 1999 Order, under the direction of the Special Master, Margaret G. Farrell, with the assistance of her then-consultant, Clarence J. Sundram, the parties engaged in lengthy negotiations that resulted in a series of agreements that have been presented for acceptance and approval. The documents now before the Court include:

(1) The 2001 Plan for Compliance and Conclusion of *Evans v. Williams* (hereinafter the Plan);

(2) A Consent Order and accompanying Settlement Agreement, filed on February 2, 2001; and

(3) The Parties' Joint Stipulated Findings of Fact, filed on December 22, 2000.

Taken together, these documents, fashioned collaboratively by the parties who are represented by able and experienced counsel, set forth a careful and detailed blueprint for achieving compliance with the Court's Orders, for the development of permanent and independent mechanisms to safeguard the rights of class members, and for the phased withdrawal of judicial oversight of the District of Columbia's mental retardation system as compliance with the Court's Orders is achieved.

The Stipulated Findings of Fact and the Consent Order—with the Settlement Agreement—will be sent for publication with this Opinion and Order. The Plan, however, is a 73–page, single-spaced document. It is summarized herein, but shall not be sent for publication.

### The 2001 Plan for Compliance and Conclusion of Evans v. Williams

Responding to this Court's Order of February 10, 1999, the Plan identifies the eight goals of the existing Court Orders as follows:

(1) Appropriate individual habilitation in the community in the least separate, most integrated, and least restrictive environment;

(2) Protection from harm;

(3) Safeguarding consumers' personal possessions;

(4) Monitoring the service system;

(5) Advocacy for consumers;

(6) Adequate budget;

(7) Timely payment of vendors; and

(8) Essential systemic conditions.

For each of these broad goals of the prior Court Orders, the Plan identifies clear and measurable expectations of performance by providers of service and by the District of Columbia government. It identifies the relevant Court Orders, the specific tasks that must be performed to implement those Orders, and time frames within which the tasks must be performed.

For each set of Court Orders, the Plan identifies specific outcome criteria for measuring compliance therewith. This agreement by the parties on the yardsticks to be utilized in making determinations of compliance provides clear guidance to providers as well as to the District of Columbia government in implementing the Plan. Moreover, the Plan also identifies a specific standard of compliance for each set of Court Orders, and sets forth the methods by which evidence will be collected and evaluated to assess compliance.

The Plan details a process for identifying individualized needs for services and supports, with input from class members, their families or guardians, case managers, clinical professionals and direct care staff, and advocates. It requires the aggregation of information regarding the needs for services and supports to enable its use in planning and budgeting for the overall mental retardation service system. It provides for an explicit opportunity for plaintiffs to review and comment upon the adequacy of proposed budgets to meet the needs of individuals who rely upon the mental retardation system for services and supports. Furthermore, it creates a process for external and independent monitors to have input into the budget-making process based upon their findings during monitoring of the services and supports available to individuals with mental retardation and developmental disabilities.

The Plan requires a broad range of competency-based training to be provided to staff who deliver services and supports to individuals with metal retardation and developmental disabilities. It also requires that a wide range of policies and procedures be revised and updated to reflect the goals of the Court Orders, in a process that is open and accessible to plaintiffs, the United States, and other interested stakeholders.

The Plan requires audits of the class members' accounts going back for at least ten years and includes a commitment by the District of Columbia government to repay any sums of money that may be owed to them.

The Plan creates several new safeguards for individuals with mental retardation and developmental disabilities in the District of Columbia. First, it calls for a complete revision of the existing statutes to establish in law the rights that have been declared in the Court's Orders, while also updating the laws, consistent with a set of legislative principles agreed upon by the parties, to reflect contemporary standards and practices. Second, it requires the creation of a new quality assurance program, the implementation of a new procedure for the reporting and investigation of unusual incidents, the creation of a Fatality Review Board, and the adoption of new mechanisms to prevent the misuse or overuse of control procedures such as restraints, time-outs, and psychotropic medications. Third, it recognizes that the enforcement of rights that have been legally declared requires access to effective legal and lay advocacy. A cornerstone of the Plan is the creation of a new, independent, and durable nonprofit agency called the Quality Trust for Individuals with Disabilities (the Quality Trust) and the provision of a method of financing its operations so as eventually to provide for its financial independence from the annual District of Columbia budgeting process.

The Quality Trust will have three essential functions. First, it will provide independent monitoring of the quality of services and supports available to individuals with mental retardation and developmental disabilities, and serve as an independent voice for consumers in dealing with the District of Columbia government. Second, it will provide lay advocacy to represent

consumers with respect to day-to-day issues that affect their quality of life and their access to services and supports, including representation in grievance and administrative proceedings. Third, it will not only provide legal representation for those individuals who have no lawyers but also will be a resource to other legal advocates and help raise the standard of legal representation of individuals with mental retardation and developmental disabilities. Such legal representation and lay advocacy services are intended to supplement, not supplant, the services that already are required by law.

Until this case is terminated, the Court Monitor also will remain as a safeguard for class members. The Plan provides for a close working relationship between the Court Monitor and the Quality Trust to avoid unnecessary duplication of effort. As defendants achieve compliance with the outcome criteria in the Plan, and the related Court Orders are vacated, the jurisdiction for monitoring conditions will shift from the Court Monitor to the Quality Trust.

While the Plan is not intended to be an independently enforceable document, the parties do intend that there will be accountability for its implementation. The Plan requires periodic progress reports to the Special Master on its implementation and calls for status conferences with the Court to be scheduled at least bimonthly. The parties agree that if the Court finds that defendants have satisfied the outcome criteria set forth in the Plan, they also will be in compliance with the related Court Orders. Any failure of defendants to implement the tasks identified in the Plan so as to meet the requirements of the related Court Orders would be evidence of noncompliance with those Orders. The Plan provides that until the existing Court Orders are vacated, plaintiffs may seek appropriate judicial relief, including requesting orders requiring compliance with the Order(s) underlying the objectives of the Plan.

Finally, the Plan provides for a phased and orderly withdrawal of judicial oversight of the District of Columbia's management of its mental retardation service system. The mechanisms set forth in the Plan provide that defendants may move the Special Master for a finding of compliance with particular Orders when they believe that they have achieved compliance. Plaintiffs and the United States have the right to object to any such motion and to have an evidentiary hearing before the Special Master. The Special Master then is to submit to the Court proposed findings of fact and conclusions of law based upon the evidence introduced during the hearing. If the Court concludes that defendants have achieved compliance, it may vacate and dismiss the related Court Order(s). Once all of the Court Orders are vacated after defendants establish that they have achieved compliance, the declaratory judgment in this case will remain.

### The Consent Order and the Settlement Agreement

The Consent Order and the Settlement Agreement (with the latter being Exhibit A to the former) create an external monitoring body to permanently protect the interests of the class members once this case ends.

*Consent Order.* In the Consent Order, defendants have agreed to fund the Quality Trust with a total of $31.5 million over the next eleven years. Initially, defendants shall endow the Quality Trust with $11 million in order to better ensure its financial independence in carrying out its duties. The $11 million endowment is to be deposited in an interest bearing account for the sole use of the Quality Trust. So that the endowment may grow, defendants

have agreed to provide $2 million in annual funding for the exclusive use of the Quality Trust for the first five full years of its existence. During that time, the endowment will be allowed to grow earnings so as to increase the principal. For the next five years, defendants have agreed to fund the Quality Trust with gradually decreasing amounts of annual funding: in 2006, $1.9 million; in 2007, $1.8 million; in 2008, $1.7 million; in 2009, $1.6 million; and in 2010, $1.5 million. If needed during this time, the annual earnings of the endowment's principal may be used as supplementary money to fund the operations of the Quality Trust. Between now and the beginning of the first fiscal year, defendants have agreed to pay to the Quality Trust an additional $2 million, prorated for the period of time left before the start of the fiscal year. Defendants have agreed to provide the Quality Trust with the residual prorated amount in 2011. The Consent Order specifies that all of the monies to be paid are to be paid in Year 2000 dollars. The Consent Order also provides for access rights to facilities, persons, documents, and other materials for the Quality Trust.

In exchange for defendants' endowment and annual funding of the Quality Trust, plaintiffs and the United States have agreed to waive all claims for past contumacious conduct of defendants as of the date of the entry of the Consent Order and approval of the Settlement Agreement. There are important exceptions to this waiver. For example, no matter what the time frame, plaintiffs and the United States have reserved the right to seek claims on class members' behalf related to: the safeguarding and/or management of the benefits, personal possessions, wages, bank accounts, and/or funds of class members; the failure to provide adequate legal representation and lay advocacy services to class members; and claims for damages based on other possible causes of action

independent of the Court's Orders. To that end, defendants have agreed to push back the statutory limitation periods, thus enabling class members to bring suits for prior claims as of January 15, 1998. Plaintiffs and the United States retain the right to seek monetary or non-monetary contempt sanctions for defendants' acts after the date of the entry of the Consent Order.

*Settlement Agreement.* In addition to the Consent Order, the parties have negotiated a separate Settlement Agreement (Exhibit A to the Consent Order). This was necessary for a number of reasons. First, a designated member of the Quality Trust is to sign the Settlement Agreement, so that the Quality Trust will be bound by its terms. Second, the Quality Trust is to exist beyond the life of this class action. Once compliance with the existing Orders is achieved and the case is dismissed, there will be a surviving document that will enable interested parties to hold the Quality Trust accountable for advancing the interests of individuals with mental retardation and developmental disabilities.

The Settlement Agreement sets forth in detail the structure of the Quality Trust, the control and use of the funds to be provided by defendants, the obligations of the Quality Trust, and the Trust's access rights.

### Approval of the Consent Order and the Settlement Agreement

The complaint in this case was filed on February 23, 1976, and it was assigned to Judge John H. Pratt. Judge Pratt granted plaintiffs' motion for class certification on June 3, 1976. On June 16, 1978, Judge Pratt issued a Final Judgment and Order, which unfortunately proved to be about as final as peace in the Balkans. Judge Pratt, long an exceptional jurist as a member of this court, died in 1995, and the case was reassigned to the undersigned on Au-

gust 29 of that year. Margaret G. Farrell was appointed as Special Master on October 1, 1995; Clarence J. Sundram (who had contributed significantly to this case as a consultant) was appointed as co-Special Master on February 20, 2001.

The dispute seemed intractable until last year, towards the end of which there were commendable and extensive efforts by Mrs. Farrell, Mr. Sundram, and counsel for the parties seeking to resolve the problems faced by all. Those efforts led to the documents now before the Court. The first to have been filed was the Parties' Joint Stipulated Findings of Fact (December 22, 2000), which the Court hereby adopts. After the submission of the 2001 Plan for Compliance and Conclusion of *Evans v. Williams* (February 2, 2001), the Consent Order, of which Exhibit A thereto was the Settlement Agreement, was tendered. The Consent Order was approved conditionally by the undersigned on March 4, 2001, with what has been characterized as a fairness hearing having been scheduled for March 5. Prior to that hearing, proper notice duly having been given, plaintiffs' counsel met extensively with class members (and, where applicable, members of their families) and defendants' counsel met with providers of services to the class members. A hearing was held on March 5. The status of the case then was dealt with fully by the co-Special Masters and by counsel for all parties, and testimony was received from several class members and the president of The Arc of the District of Columbia. No opposition of any sort has been expressed to the very carefully designed proposals for the resolution of this case.

Under Rule 23(e) of the Federal Rules of Civil Procedure, a compromise of a class action may not be effectuated without approval of the court. This case is unusual, in that a "final judgment" in plaintiffs' favor was entered more than 20 years ago; the problem has lain in actually meeting the needs of the members of the plaintiff class. The Court commends the co-Special Masters and all counsel not only for resolving their differences, but for the exceptionally thorough manner in which they have agreed upon procedures for dealing with the problems that have persisted for so long. The Court readily concludes that the proposed compromise of the controversy, which will be of substantially greater benefit to the class than would continued litigation over how to deal with past conduct by defendants, is fair, reasonable, and adequate.

Accordingly, on consideration of all of the foregoing factors, it hereby is

ORDERED, that the Parties' Joint Stipulated Findings of Fact are adopted. It hereby further is

ORDERED, that the 2001 Plan for Compliance and Conclusion of *Evans v. Williams* is approved as, in effect, a statement of the conditions for the expected vacating of the Court's relevant prior Orders. It hereby further is

ORDERED, that the Consent Order formally is entered and the Settlement Agreement attached thereto is approved.

SO ORDERED.

## CONSENT ORDER

### I. Background

On February 10, 1999, this Court imposed contempt fines of $5,096,340.00 for Defendants' failure to comply with certain Court Orders in this case. *Evans v. Williams*, 35 F.Supp.2d 88 (D.D.C.1999). On March 31, 2000, the United States Court of Appeals for the District of Columbia Circuit reversed and remanded this matter for further proceedings. *Evans v. Williams*, 206 F.3d 1292 (D.C.Cir.2000). The Court of Appeals determined that the

contempt fines were criminal in nature and could not be imposed in the absence of appropriate procedural safeguards. *Id.* at 1297 n. 4.

In order to address the issues still before the Court on remand, the parties have agreed to the following Consent Order. In this Consent Order, the Defendants and/or the District of Columbia agree to endow and annually fund, pursuant to the provisions below, a durable, independent, non-profit organization that will monitor and advance the individual and collective interests of people with developmental disabilities in the District of Columbia's service delivery system, including *Evans* class members, in exchange for the waiver of any and all claims for past violations of the Court's Orders in this case as specified in section II of this Consent Order. The specifics of the parties' agreement are set forth below.

## II. Resolution of Past Non–Compliance with the Court Orders

The parties have agreed to this Consent Order which resolves all issues related to Defendants' past non-compliance with the Orders in this case, including those related to the Court's February 10, 1999 finding of contempt and the imposition of fines, subject to the following:

A.   Except as otherwise stated in this section, the Plaintiffs and the Plaintiff–Intervenor agree to waive any and all claims for past violations of the Court's Orders in this case based on Defendants' past non-compliance with the existing Court Orders in this case during the period up to and including the date of the Court's entry of this Consent Order. The parties agree that this Consent Order does not affect the previously negotiated Settlement Agreement, dated September 22, 2000, as to the Symbral Foundation and the class members receiving services there-

from. In addition, Plaintiffs do not waive the claim for costs and reimbursement for the care of class member Beverly Sutton. Plaintiffs do not waive claims regarding University Legal Services, Inc., Protection and Advocacy Program's costs, expenses and attorneys' fees in this case that may have arisen prior to the date of this Order, subject to any available defenses or objections raised by the Defendants.

B.   The Plaintiffs and Plaintiff–Intervenor agree to waive any claim for damages based on Defendants' past non-compliance with the existing Court Orders in this case during the period up to and including the date of the Court's entry of this Consent Order. However, the Plaintiffs and the Plaintiff–Intervenor specifically do not waive any claim they may have for damages or equitable relief due to Defendants' conduct prior the date of the Court's entry of this Consent Order, with regard to the following categories of claims only:

1.   safeguarding and/or management of the benefits, personal possessions, wages, bank accounts and/or funds of class members;

2.   the failure of the Superior Court of the District of Columbia to provide legal representation and lay advocacy services as required by the Orders of this Court in this case and by statute (*see* Title 6 D.C.Code Section 1901 *et seq.*); and

3.   claims by class members for damages or other relief based on causes of action independent of the Court Orders in this case. In relation to such claims only, Defendants have agreed to waive the requirements of Title 12 D.C.Code Section 309 for class members who first suffered damages on or after January 15, 1998, through the date this Order is

entered by the Court, except Defendants expressly do not waive the requirements of Title 12 D.C.Code Section 309 for claims brought under wrongful death or survival statutes.

C. Nothing in this Consent Order shall be construed to prevent the Plaintiffs or Plaintiff–Intervenor from seeking equitable relief to remediate current violations (that exist as of the date of the Court's entry of this Consent Order) or new violations of this Court's Orders. Evidence of Defendants' conduct prior to the date this Order is entered by the Court shall be admissible in such proceedings, subject to any available defenses or objections raised by Defendants.

D. Nothing in this Consent Order modifies the current Court-ordered fine schedule and process with respect to findings of contempt based on violations of this Court's Orders which may occur after the Court's entry of this Order.

E. The Quality Trust shall not provide direct legal representation to class members with regard to any claims based on violations of the Court Orders in this case which occurred prior to the date this Order is entered by the Court.

## III. Creation and Funding of the Quality Trust

A. The parties agree to the creation of an independent, nonprofit organization to be named the Quality Trust for Individuals with Disabilities, Inc., (hereinafter "Quality Trust" or "QT").

B. Within 15 days of the Court's entry of this Consent Order, the Quality Trust shall be incorporated as a nonprofit, 501(c)(3) corporation under the District of Columbia Nonprofit Corporation Act, approved August 6, 1962 (76 Stat. 265; D.C.Code Section 29–501 *et seq.*). The Quality Trust is to be incorporated as an independent entity to insulate it from control by the parties.

C. The mission and purpose of the Quality Trust is set forth in a Settlement Agreement (attached as Exhibit A) which is to be signed by the parties and a designated representative of the Quality Trust, who is legally competent to bind the Quality Trust, and filed with this Court.[1] The Settlement Agreement specifies that the Quality Trust will provide, *inter alia*, monitoring, legal services and lay advocacy services for individuals with developmental disabilities[2] in the District of Co-

---

1. The Settlement Agreement shall not be incorporated into or be a part of this Consent Order. The Consent Order and Settlement Agreement are related documents. The Consent Order sets out the obligations of the parties regarding the endowment and funding of the Quality Trust in exchange for the waiver of certain fines and other liability. The Consent Order is to be adopted by the Court and shall be enforceable for procedures and remedies available for violations of a court order. The Settlement Agreement is an agreement amongst the parties and the Quality Trust which sets forth the Quality Trust's operations and duties in order to ensure that the Quality Trust complies with the parties'

agreement regarding its mission and functions. This Court shall retain jurisdiction to enforce the Settlement Agreement as to class members only, with remedies available to the parties to the Settlement Agreement under applicable contract law. Upon dismissal of this action, the Settlement Agreement shall be enforceable as a contract in the Superior Court of the District of Columbia.

2. This Consent Order provides throughout that the Quality Trust's scope of activities shall include review of services to "consumers" rather than just *"Evans* class members." "Consumers" refers to all applicants and/or recipients of services of the District of Colum-

lumbia's service delivery system.

D. Within 30 days of the filing of the Settlement Agreement signed by the Quality Trust, the Defendants and/or the District of Columbia agree to pay the sum of eleven million dollars for deposit into an interest bearing fund for the exclusive use of the Quality Trust.

E. Within 30 days of the filing of the Settlement Agreement signed by the Quality Trust, as their initial annual payment, Defendants and/or the District of Columbia shall provide the Quality Trust with annual operating funds in the amount of two million dollars, prorated for the balance of the District of Columbia's Fiscal Year 2001 which ends on September 30, 2001. On or before October 1, 2001, Defendants and/or the District of Columbia shall provide the Quality Trust with the difference between two million dollars and the prorated amount paid in Fiscal Year 2001 pursuant to the terms of this paragraph (in Year 2000 dollars).

F. Commencing October 1, 2001, for a period of five years, or until September 30, 2006, the Defendants and/or the District of Columbia shall provide the Quality Trust with annual operating funds of no less than two million dollars per year (all in Year 2000 dollars). The timing of the annual payment is set forth in paragraph III.H. below.

G. Commencing October 1, 2006, for a period of five years, or until September 30, 2011, the Defendants and/or the District of Columbia shall provide the Quality Trust with annual operating funds in the amount of 1.9 million dollars in Year 2006, 1.8 million dollars in Year 2007, 1.7 million dollars in Year 2008, 1.6 million dollars in Year 2009, and 1.5 million dollars in Year 2010 (all in Year 2000 dollars). The timing of the annual payment is set forth in paragraph III.H. below.

H. The Defendants and/or the District of Columbia shall provide annual operating funding to the Quality Trust on or before October 1 of each Fiscal Year for which the funds are intended (Fiscal Years 2001 to 2011), or as soon thereafter as the budget process will allow.

I. Nothing in this Consent Order is intended to preclude any party or the Board of Directors of the Quality Trust from advocating for funds to increase those available to the Quality Trust above two million dollars in Year 2000 dollars in any given year.

IV. Quality Trust's Right to Access and Information

A. The employees, contractors and consultants retained by the Quality Trust shall have full access to information that the Quality Trust deems reasonably necessary and appropriate in performing the monitoring and lay advocacy duties described in the Settlement Agreement. More specifically, the employees, contractors and consultants retained by the Quality Trust

bia's developmental disabilities service delivery system. The *Evans* class members (*i.e.*, those individuals who have at one time resided at Forest Haven) comprise a subset of this overall group of consumers. Defendants desire not to create a bifurcated system of services for its citizens with developmental disabilities, and therefore, agree that the Quality Trust's scope of activities shall include review of services to class and non-class members. This unified system does not extend the Court's jurisdiction to non-class members.

shall have full access to consumers, and their residences, facilities, buildings, programs, services, documents, records (including medical and departmental) and other materials that the Quality Trust deems reasonably necessary and appropriate in performing the duties of the Quality Trust's monitoring and lay advocacy functions. The Quality Trust may obtain copies of the aforementioned documents, records, and other materials. The Defendants and/or the District of Columbia shall provide the Quality Trust with information upon request relevant to individual supports and services provided in the District of Columbia's service delivery system and the Quality Trust may request written responses from the Defendants and/or the District of Columbia in this regard. Advance notice of any visit or inspection by the Quality Trust shall not be required. Representatives of the Quality Trust may conduct private interviews and meetings with any individual including employees, contractors or agents of the District of Columbia, as well as all provider staff. The Defendants and/or the District of Columbia shall require its employees, contractors, agents, as well as provider staff, to cooperate with the Quality Trust representatives.

B. Attorneys who provide direct legal representation of consumers under a contract or other arrangements with the Quality Trust shall have the right to access their clients' records and any and all information regarding their clients that flow from their attorney-client relationship. In litigation involving the Defendants and/or the District of Columbia, attorneys shall comply with the applicable rules of discovery and procedure.

C. The Quality Trust shall safeguard the information obtained pursuant to paragraph IV.A. above, as required by all applicable laws and Court Orders protecting the confidentiality of such information.

D. The Defendants and/or the District of Columbia shall keep the Quality Trust informed in a timely fashion of relevant budgetary information regarding the District of Columbia's Mental Retardation and Developmental Disabilities Administration ("MRDDA"), or its successor. The areas about which the Defendants and/or District of Columbia shall provide information to the Quality Trust are set forth in greater detail in the Settlement Agreement attached as Exhibit A.

V. Conclusion

A. Upon (1) incorporation of the Quality Trust consistent with the terms of this Consent Order, (2) Court entry of this Consent Order, (3) filing of the Settlement Agreement referenced above with the Court with signatures from the parties and the Quality Trust, (4) the Defendants' and/or the District of Columbia's payment of eleven million dollars into an interest-bearing investment fund for the exclusive use of the Quality Trust as described in paragraph III.D. above, within 30 days from the date of the filing of the Settlement Agreement signed by the Quality Trust, and (5) the Defendants' and/or District of Columbia's initial payment to the Quality Trust within 30 days of the filing the Settlement Agreement signed by the Quality Trust, of the prorat-

ed amount of two million dollars for Fiscal Year 2001 for operating funds of the Quality Trust as described in paragraph III.E. above, the Plaintiffs and Plaintiff–Intervenor shall comply with the provisions set forth in section II above, and expressly waive any and all claims for past violations of the Court's Orders in this case as specified in section II above, based on Defendants' past non-compliance with the existing Orders in this case which occurred during the period up to and including the date of this Court's entry of this Consent Order.

B. The United States does not waive its right to pursue any other claims against the Defendants or the District of Columbia with regard to disputes or claims that involve incidents or events that occurred during any period arising under laws, statutes and regulations other than the existing Court Orders in this case.

WHEREFORE, the parties to this action, having agreed to the provisions in the Consent Order set forth above, and the Court being advised in the premises, this Court hereby GRANTS CONDITIONAL APPROVAL of this Consent Order pending final approval after a fairness hearing pursuant to Rule 23 of the Federal Rules of Civil Procedure.

WHEREFORE, the parties to this action, having agreed to the provisions in the Consent Order set forth above, and the Court being advised in the premises and having concluded that this Consent Order is a fair resolution of these matters after a fairness hearing held on March 5, 2001, this Consent Order is hereby entered as the ORDER and JUDGMENT of this Court.

## EXHIBIT A

### SETTLEMENT AGREEMENT

Pursuant to the attached Consent Order, the parties and the Quality Trust for Individuals with Disabilities, Inc., (hereinafter the "Quality Trust" or "QT"), hereby agree to the following:

I. **Structure of the Quality Trust**

A. The bylaws of the Quality Trust shall provide that the Quality Trust will have an independent Board of Directors and a body of non-voting members. The Mayor shall appoint the initial board from a list of nominees jointly developed by Defendants, Plaintiffs and Plaintiff–Intervenor. Each nominee on the list of proposed board members shall be agreed to by all parties. The Board shall thereafter be self-perpetuating. Specifically:

1. The composition and responsibilities of the Board will be established by the organization's bylaws and will include the following:

a. Each director shall be a natural person of adult age. A director need not be a citizen of the United States. At least eight members of the Board must be residents of the District of Columbia.

b. The initial Board of Directors shall consist of the directors named in the Quality Trust's Articles of Incorporation and shall hold office until their successors have been duly appointed and qualified.

c. At all times following the appointment of the first full thirteen member Board of Directors, the full Board of Directors shall consist of thirteen adult persons designated as follows:

i. Two family members of people with mental retardation and/or de-

velopmental disabilities. The initial terms of family members shall be two years, and all subsequent terms shall be three years;

ii. Two non-legal advocates for persons who have mental retardation and/or developmental disabilities. The initial terms of the nonlegal advocate members shall be two years, and all subsequent terms shall be three years;

iii. Three persons who have mental retardation and/or developmental disabilities. The initial terms of these members shall be one year, and all subsequent terms shall be three years;

iv. Two professionals with at least ten years background in a service delivery system for people who have mental retardation and/or developmental disabilities. The initial terms of professional members shall be three years and all subsequent terms shall be three years;

v. Two attorneys licensed to practice law. The initial terms of attorney members shall be three years, and all subsequent terms shall be three years; and

vi. Two citizens residing in the District of Columbia. The initial terms of citizen members shall be one year, and all subsequent terms shall be three years.

d. Following the initial term of each Board Member, the remaining Board Members, whose terms are not ending, will vote to replace the departing Board Member. A majority vote of those remaining Board Members is required to fill a vacancy. Further, the Board Member must replace a departing Board Member with an adult person who fits the designated category (*e.g.*, family member, non-legal advocate, person with mental retardation and/or other developmental disability professional with ten years experience, attorney, citizen residing in the District of Columbia) of the departing Board Member. A Board Member may succeed himself or herself. A Board Member may resign prior to the expiration of the full term. If a Board Member resigns prior to the expiration of the full term, the other Board Members shall replace that Board Member for the remainder of the unexpired term through the voting process outlined in this section. Votes regarding the appointment, removal, or replacement of a member of the Board of Directors may not be delegated to a committee of the Board.

2. The Quality Trust will be a member organization with non-voting members. The non-voting members shall be individuals with mental retardation, as well as people with other developmental disabilities, who are applicants for or are receiving protections, supports and services in the District of Columbia's developmental disabilities service delivery system, and all *Evans* class members.

B. The Quality Trust's scope of activities shall include review of services to all *Evans* class members, as well as non-class members who are applicants for or are receiving protections, supports and services in the District of Columbia's developmental disabilities service delivery system.[1] Pursuant to the attached Consent Order and this Settlement Agreement, the Quality Trust will monitor the protections, services

---

1. The extension of the Quality Trust functions to class members and non-class members does not extend the Court's jurisdiction to non-class members.

and supports provided to these individuals and offer legal services and provide lay advocacy services to these "consumers." The term "consumers" refers to all recipients and applicants for services from the District of Columbia's service delivery system for individuals with mental retardation and developmental disabilities. The *Evans* class members (*i.e.*, those individuals who have at one time resided at Forest Haven) comprise a subset of this overall group of consumers.

## II. Control and Use of the Quality Trust Fund

A. The investment fund, created with the eleven million dollars paid by the Defendants and/or District of Columbia pursuant to the attached Consent Order, shall be controlled by the Quality Trust. The Quality Trust shall invest the fund in a reasonable and prudent manner. The Quality Trust shall make reasonable efforts to increase its assets, raise funds and/or find additional resources in order to increase the principal and income of the fund.

B. From the outset, the earnings from the fund shall be reinvested to increase the principal. The earnings of this fund shall not be used to support the operations of the Quality Trust until October 1, 2006. The Quality Trust shall not use the principal to carry out its functions and operations prior to October 1, 2011. After October 1, 2011, the Quality Trust, by a vote of three-quarters of its Board Members, may utilize a reasonable portion of the principal to support its mission.

C. Nothing in this Settlement Agreement shall preclude the Quality Trust, in accordance with applicable law, from creating a separate corporate entity, consistent with the Quality Trust's mission, to achieve the Quality Trust's operational goals.

## III. Obligations of the Quality Trust

In general, the Quality Trust shall: advance the individual and collective interests of consumers with developmental disabilities, and in particular *Evans* class members; monitor the health, safety and welfare of these consumers; and monitor the protections, services and supports provided to these consumers. The Quality Trust also shall provide for individual and/or collective legal services and lay advocacy services for consumers as set forth in greater detail below. The Board of Directors shall periodically determine how to apportion its resources among monitoring, legal representation services and lay advocacy or other strategies, consistent with the Quality Trust's mission and functions, to advance the individual and/or collective interests of consumers with developmental disabilities, and in particular *Evans* class members. This process shall be informed by the Defendants' and/or the District of Columbia's level of compliance with the *Evans* 2001 Plan.

### A. *Monitoring*

The Quality Trust shall create a Monitoring Unit which shall:

1. Develop an annual monitoring plan with input from the parties, consumers, families, providers and advocates.

2. Monitor the adequacy, safety and quality of consumers' residential and habilitation programs and supports.

3. Receive and review with regard to consumers from the District's Mental Retardation and Developmental Disabilities Administration ("MRDDA") or its successor, all of MRDDA's serious incident reports and investigation reports of

serious incidents, including deaths, and aggregate information regarding all incidents.

4. Write annual reports, and, in addition, such other periodic reports as the Quality Trust may determine to be necessary. Such reports are to be made public and provided to: (A) the Special Master and the parties' counsel of record (until this case is no longer subject to Court supervision); (B) the Defendants and/or the branches of the District of Columbia, including the Departments of Human Services and Health (or their successors), the Chief Financial Officer and the Mayor; and (C) the District of Columbia Council. The reports shall make observations with regard to the adequacy of the protections, services, and supports provided to consumers and offer recommendations for any needed improvements. The Defendants and/or the District of Columbia shall respond promptly to these reports in writing, including specific corrective action steps they will implement or have implemented, along with timelines if the actions have not been implemented, to address current problems.

5. Receive and review information with regard to the District of Columbia budget requests for MRDDA or its successor sufficient to permit its timely monitoring and comment about District of Columbia budget decisions affecting consumers.

6. Annually inform the Defendants and/or the District of Columbia of the consumer needs, based on information collected during monitoring activities, in a timely manner, to permit such information to be considered in developing the District of Columbia's proposed budget for the service delivery system for individuals with developmental disabilities for the following Fiscal Year.

7. Apply at least the following standards in its monitoring and reviews: (A) the specific outcome criteria developed as part of the *Evans* 2001 Plan; (B) certification and private accreditation standards; (C) the District of Columbia's own standards including licensing requirements; (D) Medicaid and Medicare regulations and conditions of participation; and (E) the District of Columbia's performance standards in private provider contracts.

8. Be physically co-located with the *Evans* Independent Court Monitor so as to enhance communication regarding monitoring activities in order to avoid redundancy, until the *Evans* case is no longer subject to regular Court supervision. The Independent Court Monitor shall remain directly responsible to the Court, and not to the Quality Trust. As each *Evans* Order is vacated by the Court, monitoring of corresponding operations shall be transferred from the Independent Court Monitor to the Quality Trust, and shall no longer be subject to Court supervision.

B. *Legal Services*

1. The Quality Trust shall work to raise the level of advocacy among court-appointed attorneys by, for example, providing training, drafting model pleadings and developing in-house appellate advocacy capacity. The Quality Trust's legal representatives will supplement (not replace) the existing pool of attorneys appointed by Superior Court and will seek to be appointed in cases of consumers who have heretofore been deprived competent representation.

2. The Quality Trust shall contract with or otherwise arrange for legal representation services for consumers. The scope and content of the contract shall be negotiated by the Quality Trust and the provider. The Quality Trust will oversee the performance of the provider under this contract to ensure that the

consumers are getting the legal representation services they require.

3. The Quality Trust shall not provide direct legal representation to any individual but may contract or make other arrangements for direct representation from other independent legal services providers. Nothing herein shall preclude lay advocates from assisting consumers in administrative proceedings.

## C. *Lay Advocacy Services*

Because some of the advocacy needs of the consumers do not require the services of an attorney and can be provided more effectively and less expensively through the availability of lay advocates, the Quality Trust will create a Lay Advocacy Program which shall provide the following services:

1. Attend Individual Support Plan ("ISP") and other team meetings for consumers for whom they are responsible and advocate for the needs and choices of the consumers at these meetings. The advocates will attempt at all times to facilitate the consumers' self-expression, or in the alternative, will consult with duly appointed representatives or surrogate decision-makers, where appropriate.

2. Regularly interact with the case managers of the consumers on their caseloads to keep abreast of any issues impacting on the protections, services and supports provided to consumers.

3. Receive and review serious incident reports and investigation reports for consumers for whom they are responsible, and advocate for the consumers' safety and well-being in the course of such investigations.

4. Receive and review all monitoring reports related to the consumers on their caseloads and follow up to ensure that necessary corrective action is taken.

5. Periodically visit consumers receiving residential and day treatment services to ensure that consumers are safe and satisfied with the services and supports they are receiving and that the services and supports are adequate to meet the individualized needs of the consumers.

6. Advocate on behalf of individuals and/or groups of consumers to ensure that their complaints are investigated in a timely fashion and that the consumers are satisfied with the resolution. In the event that the time frames required for resolution are not complied with or that the proposed resolution is otherwise unsatisfactory, the advocate shall consult with the consumer(s), or other appropriate decision-maker, to determine the appropriate course of action.

a. The Lay Advocacy Program and the Legal Services component shall establish a program to facilitate the immediate referral and coordination of cases requiring the assistance of an attorney.

b. Consumers may seek immediate referral to the Legal Services component from the Lay Advocacy Program.

7. Attend court hearings for the consumers on their caseloads and work with the assigned attorneys in ensuring that consumers' needs for protections, services and supports are met.

8. Some consumers will have family members, guardians or friends who will serve as their advocates while others will rely on the services of paid lay advocates. The advocacy program will provide training not only to the lay advocates, but also to such volunteer advocates.

9. This advocacy unit will supplement (not replace) the existing pool of advocates acting on behalf of family, friends, or those appointed by Superior Court or

appointed pursuant to existing Orders in this case. The Lay Advocacy Program will prioritize cases of consumers who heretofore have not received advocacy services.

## IV. Quality Trust's Right to Access and Information

A. The employees, contractors and consultants retained by the Quality Trust shall have full access to information that the Quality Trust deems reasonably necessary and appropriate in performing the monitoring and lay advocacy duties described in the Settlement Agreement. More specifically, the employees, contractors and consultants retained by the Quality Trust shall have full access to consumers, and their residences, facilities, buildings, programs, services, documents, records (including medical and departmental) and other materials that the Quality Trust deems reasonably necessary and appropriate in performing the duties of the Quality Trust's monitoring and lay advocacy functions. The Quality Trust may obtain copies of the aforementioned documents, records, and other materials. The Defendants and/or the District of Columbia shall provide the Quality Trust with information upon request relevant to individual supports and services provided in the District of Columbia's service delivery system and the Quality Trust may request written responses from the Defendants and/or the District of Columbia in this regard. Advance notice of any visit or inspection by the Quality Trust shall not be required. Representatives of the Quality Trust may conduct private interviews and meetings with any individual including employees, contractors or agents of the District of Columbia, as well as all provider staff. The Defendants and/or the District of Columbia shall require its employees, contractors, agents, as well as provider staff, to cooperate with the Quality Trust representatives.

B. Attorneys who provide direct legal representation of consumers under a contract or other arrangements with the Quality Trust shall have the right to access their clients' records and any and all information regarding their clients that flow from their attorney-client relationship. In litigation involving the Defendants and/or the District of Columbia, attorneys shall comply with the applicable rules of discovery and procedure.

C. The Quality Trust shall safeguard the information obtained pursuant to paragraph IV.A., as required by all applicable laws and Court Orders protecting the confidentiality of such information.

D. The Defendants and/or the District of Columbia shall keep the Quality Trust informed in a timely fashion of relevant budgetary information regarding MRDDA or its successor. The areas about which the Defendants and/or the District of Columbia shall provide information to the Quality Trust include the following:

1. The portions of the budget that address specific consumer needs for residential and day program services, equipment, medical and clinical care, etc.;

2. The portions of the budget that address system needs for managing, monitoring, and overseeing the system of services for consumers;

3. The portions of the budget that address any capital appropriations that

may be required to meet the needs of the consumers (*e.g.*, for construction or renovation of program sites or residences);

4. The amount of the appropriation being requested by the Mayor from the City Council to meet consumer needs;

5. The final appropriation; and

6. The District of Columbia Department of Health's proposed and actual budgets which include the District of Columbia's share of payments to Medicaid providers.

## V. Legislative Principles

The Plaintiffs and the Defendants agree that if the appropriate legislative body does not enact legislation to implement the Legislative Principles (attached to the *Evans* 2001 Plan), before the end of the 2001 legislative session, the parties will accomplish the objectives of the Principles through alternative means. The United States does not take a position with regard to such proposed and/or pending legislation or to the Legislative Principles attached to the Plan.

## VI. Judicial Review

Until the *Evans* case is dismissed, this Court shall retain jurisdiction to enforce the Settlement Agreement as to class members only, with remedies available to the parties to the Settlement Agreement under applicable contract law. Upon dismissal of this action, the Settlement Agreement shall be enforceable as a contract in the Superior Court of the District of Columbia.

### PARTIES' JOINT STIPULATED FINDINGS OF FACT

Dec. 22, 2000

## I. *Introduction*

On February 10, 1999, this Court ordered the Special Master to develop findings of fact with regard to the status of Defendants' compliance with Court Orders in this case. In order to assist the Special Master to comply with this Order, the parties, in order to resolve their differences, avoid costly and unnecessary litigation, and continue their collaborative relationship, have agreed on the following stipulated findings of fact. The stipulations apply to the time period up to and including the date of the statement or report that is the source of the information.

## II. *Stipulations*

### GENERAL FINDINGS

1. Issues related to the District of Columbia's system of support for individuals with developmental disabilities (hereinafter "District's system") represent one of the most serious breakdowns in the District government over the last two decades. The measure of a society is how it treats its most vulnerable citizens. In this case, the District government failed. Prepared Statement of Anthony A. Williams, Mayor of the District of Columbia (hereinafter "Mayor's Prep. Stmnt."), June 1, 2000 at 1 (Master's Exh. J, June 30, 2000).

2. Mistakes in the District's system of support for individuals with developmental disabilities cover 20 years of neglect and mismanagement. Mayor's Prep. Stmnt. at 1.

3. The District government is seriously broken from years of disinvestment, mismanagement, poor oversight and neglect. Mayor's Prep. Stmnt. at 1.

4. The breakdown in services to clients with developmental disabilities in the District's system had been 19 years in the making. Mayor's Prep. Stmnt. at 1.

5. The Mayor and his administration were aware of problems in the District's Mental Retardation and Developmental Disabilities Administration ("MRDDA") but were not aware that some of the sys-

temic problems could lead to threats to the life and safety of some of the most vulnerable citizens in the District's system. Mayor's Prep. Stmnt. at 2.

6. In spite of some progress in fixing the District's system of support for individuals with developmental disabilities in recent months, much remains to be done. Mayor's Prep. Stmnt. at 2.

7. Two decades of neglect in the District's system has taken a toll on the clients served in the system. Mayor's Prep. Stmnt. at 3.

8. The District government has fundamentally failed its obligation to disabled persons and their families. Painful experience has taught that the District's MRDDA system is not a system. Mayor's Prep. Stmnt. at 3.

9. The District's system of support for individuals with developmental disabilities must do a better job assessing risks and being proactive. Mayor's Prep. Stmnt. at 4.

10. The District's support system is a problem that urgently needs to be fixed. Mayor's Prep. Stmnt. at 4.

11. The District government inherited by Mayor Williams was almost completely decimated as a result of years of disinvestment, mismanagement, and poor performance. Prepared Statement of Carolyn N. Graham, Deputy Mayor of the District of Columbia (hereinafter "Deputy Mayor's Prep. Stmnt."), May 22, 2000 at 1 (Master's Exh. K).

12. Problems existed in MRDDA under the present administration. Deputy Mayor's Prep. Stmnt. at 2.

13. The District was aware of problems of· poor care provided at group homes, systemic failures and other issues as a result of a *Washington Post* article in February 1999. Deputy Mayor's Prep. Stmnt. at 3.

14. MRDDA needed legal representation in guardianship hearings that involve citizens with developmental disabilities. Deputy Mayor's Prep. Stmnt. at 4.

15. MRDDA has had trouble getting provider contracts processed in a timely manner. Deputy Mayor's Prep. Stmnt. at 5.

16. The problems in the District's support system for individuals with developmental disabilities were even more egregious than originally and subsequently described. Deputy Mayor's Prep. Stmnt. at 6.

17. The Mayor issued a report that acknowledged that the District's entire mental retardation and developmental disabilities system was fundamentally unable to deliver even the most basic services. It is definitive that the current system failed because of a poor design and years of neglect and disinvestment. The District's system intended to address the needs of those with developmental disabilities suffers from fundamental problems. Examples of such fundamental problems in the District's system include; there are no clearly defined quality service standards; there is no quality improvement process; there are no significant penalties for lack of compliance with existing system's requirements; there is fragmentation and poor coordination in government business processes; there is no investment in technology to augment business processes internal and external to government; there is a poorly trained workforce both in and outside of government; there is a highly inconsistent, underpaid workforce external to government; and there are limited supported employment opportunities. Well over sixty percent of the population in the District's community residential facilities ("CRF's") could benefit from such opportunities. The District's system favors high cost institutional-based care as opposed to a system that supports and encourages

independence and inclusion. Deputy Mayor's Prep. Stmnt. at 7–9.

18. The District's support system requires a major overhaul that will not happen overnight. Deputy Mayor's Prep. Stmnt. at 10. While there have been some recent accomplishments, far more remains to be done. Deputy Mayor's Prep. Stmnt. at 14.

19. Painful experience has taught that the District government currently lacks the capacity to adequately deliver the services that the individuals with developmental disabilities in the District's system require. Deputy Mayor's Prep. Stmnt. at 17.

20. The entire mental retardation and developmental disabilities service delivery system is incapable of providing quality service. Preliminary Findings on the Mental Retardation and Developmental Disabilities Service Delivery System, Government of the District of Columbia, Office of the Deputy Mayor for Children and Families, Jan. 18, 2000 (hereinafter "D.C. Prelim. Rep.") at 1 (emphasis in original).

21. The District's mental retardation and developmental disabilities service delivery system is broken. D.C. Prelim. Rep. at 5, 39.

22. The District's system is highly dysfunctional and unable to execute its mission at its most basic level through its current structure and procedures. D.C. Prelim. Rep. at 2.

23. After the closure of Forest Haven, compliance with the *Evans v. Williams* Court–Ordered mandates began to deteriorate. D.C. Prelim. Rep. at 11 (fn.5). Many of the requirements of the *Evans* Court Orders are not being complied with. D.C. Prelim. Rep. at 14. While Court Orders in the *Evans* case apply only to a portion of the customers served by MRDDA, there is no programmatic or clinical reason to differentiate between class members and other customers. D.C. Prelim. Rep. at 17.

24. The District is mired in a philosophy of service delivery that is reminiscent of approaches that are more than 20 years old and that consequently, neither MRDDA's mission statement nor its operation reflects the most current philosophy demonstrated nationally in best practice models. D.C. Prelim. Rep. at 22.

25. The entire District service delivery system must be redefined and rebuilt. D.C. Prelim. Rep. at 2.

26. The need for reform in the District's system ranges from the broadest to the smallest of issues and simply "tinkering around the edges" will not solve the systemic problems in the system. D.C. Prelim. Rep. at 11.

27. Fixing the District's system requires a combination of short and long-term initiatives that are integrated and coordinated. Previous attempts to analyze and fix problems have been too narrow in scope and did not take into account the overall impact of piecemeal solutions. D.C. Prelim. Rep. at 5, 39.

28. MRDDA does not and cannot meet its stated mission which is to serve individuals with mental retardation and other developmental disabilities. Defendants' staffing pattern and approach has been and still is designed to serve only people with mental retardation. MRDDA is not adequately meeting the needs of people with mental retardation and is not capable of effectively meeting the aspect of its mission to serve people with developmental disabilities other than mental retardation. D.C. Prelim. Rep. at 21.

29. Upon further review of the system, Defendants re-confirmed their earlier conclusion that communication and coordination between departments and even agencies within departments is inadequate.

Addendum to Preliminary Findings on the Mental Retardation and Developmental Disabilities Service Delivery System, Government of the District of Columbia, Office of the Deputy Mayor for Children and Families, Mar. 2, 2000 (hereinafter "D.C. Addendum Rep.") at 3.

30. There is no single coordinated plan to ensure lifetime support to individuals with mental retardation and developmental disabilities. D.C. Addendum Rep. at 3.

*LEAST RESTRICTIVE COMMUNITY SETTING*

31. The District relies on a facility-based model of service delivery that does not lend itself to providing community living and support services that are fully integrated, customer-directed, flexible, cost efficient, and which promote an optimum quality of life. Final Report to the Government of the District of Columbia, Office of the City Administrator, Office of the Deputy Mayor for Operations, Georgetown University Child Development Center, Jan. 18, 2000 (hereinafter "D.C. Georgetown Rep.") at 2.

32. There is a general lack of communication between MRDDA and the Office of Program Operations which results in a lack of coordination in planning to ensure that the appropriate types of facilities are available for the placement of MRDDA clients by MRDDA. D.C. Addendum Rep. at 9. Ultimate decision-making in person centered planning rests with MRDDA even though it is "demonstrably ill-equipped" to carry out this function. D.C. Georgetown Rep. at 15. There are no structural mechanisms within the District system for people with disabilities and their families to select where and with whom they live; participate in the design of services they receive; determine from whom they receive services; and participate in program evaluation including customer satisfaction surveys. D.C. Georgetown Rep. at 15.

33. The District's operating philosophy is the same as it was prior to the closing of Forest Haven resulting in "mini-Forest Havens" rather than a person-centered planning philosophy. D.C. Prelim. Rep. at 2.

34. The District's Medical Assistance Administration ("MAA") and MRDDA have failed to implement an effective Medicaid Home and Community Based Waiver. The District's commitment to self-determination embodied in person centered planning cannot be met without the funding stream provided by an effective waiver. D.C. Prelim. Rep. at 35–36.

35. The lack of an effective home and community based waiver is in itself sufficient to keep the District from effectively implementing person centered planning. D.C. Addendum Rep. at 4.

36. The District does not have a functioning home and community based waiver program. D.C. Addendum Rep. at 8. Defendants acknowledge that the District has "lagged behind" in instituting a fully functional waiver. D.C. Addendum Rep. at 6.

37. The District's competitive procurement process is not suitable for the procurement of service to the MRDDA population in that awarding the contract to the lowest bidder sometimes results in awards that do not support the goals of person centered planning and respect for individual self-determination. D.C. Prelim. Rep. at 31.

38. MRDDA and provider managers and supervisors may lack sensitivity to the right of persons with mental retardation and developmental disabilities to make choices. D.C. Prelim. Rep. at 16.

*STAFF TRAINING*

39. Formal training programs and requirements for both District and private sector employees are nearly non-existent in the mental retardation and developmental disabilities service delivery system. D.C. Prelim. Rep. at 3.

40. MRDDA employees have not been provided adequate training for the jobs that they do. D.C. Prelim. Rep. at 17.

41. Residential and transportation provider employees within the District's system have not been provided adequate training for the jobs that they do. D.C. Prelim. Rep. at 17.

42. There has been a lack of appropriate training of MRDDA managers and employees. There is no formal training program in place. D.C. Prelim. Rep. at 18.

*PROTECTION FROM HARM/INCIDENT REPORTING/INVESTIGATIONS*

43. There is no formal policy or procedure detailing the difference between an unusual incident report and an "alert," that MRDDA staff had different understandings of these two instruments. Defendants acknowledge that more review of the "alert" process is necessary. D.C. Prelim. Rep. at 14.

44. There is a lack of basic policies and procedures in the District system. There was no policy to allow employees to call 911 without first getting a supervisor's approval until December 1999. There was no policy to provide for safe transportation of customers in existence prior to late 1999, and that it was developed only after a customer died after being left unattended in a van. D.C. Prelim. Rep. at 19.

45. Policies and procedures are often not followed in the District's system. For example, many providers do not provide MRDDA with unusual incident reports within 24 hours and do not submit reports on all incidents that should be reported pursuant to current MRDDA policies. D.C. Prelim. Rep. at 19.

46. MRDDA staff do not always track down the outcome of matters referred for action. Once items are referred to other agencies for action, little follow-up is done to determine the status of investigations. This problem is exacerbated by a general failure to share information among involved organizations. D.C. Prelim. Rep. at 20.

47. There is a large backlog of unusual incident reports within the Bureau of Program Operations and Contracts ("BPOC") which is to review them and forward them for appropriate action. D.C. Prelim. Rep. at 24. Since at least November 1, 1999, all unusual incident reports are not sent to the Office of Inspection and Compliance ("OIC") per current policy requirements. D.C. Prelim. Rep. at 25.

48. There has been a lack of appropriate management at the District's Department of Human Services ("DHS") regarding OIC functions. From March to December 1999, more than 600 unusual incident reports were received, yet little action was taken to address workload issues. D.C. Prelim. Rep. at 27.

49. The District's Internal Affairs Division ("IAD") has a growing backlog of investigations related to alleged abuses within MRDDA. D.C. Prelim. Rep. at 27.

50. DHS' Policies and Procedures for Reporting Unusual Incidents are not always followed with regard to the timely submission of unusual incident reports or currently with the submission of all reports to OIC. The process for submitting incident reports to OIC/IAD is delayed through MRDDA. The delay in receiving notification can hinder an investigation since evidence may be removed or destroyed or persons involved may be moved. D.C. Prelim. Rep. at 28.

51. There is no formal communication structure between the District's Licensing and Regulation Administration ("LRA"), OIC, and MRDDA and that this lack of communication has created gaps in monitoring and handling routine complaints and incident reports. D.C. Prelim. Rep. at 29.

52. There is no formal communication structure that requires providers or clients to report complaints or incidents to LRA. In some cases, complaints and incident reports are never reported to LRA or MRDDA. D.C. Prelim. Rep. at 29.

53. OIC does not adequately coordinate with the District's Department of Health ("DOH"), the District's Metropolitan Police Department ("MPD"), case managers, or others involved in the incident reporting process. The agencies charged with gathering, disseminating, investigating, and reporting on unusual incident reports do not coordinate or communicate on a routine basis. D.C. Prelim. Rep. at 29.

54. MRDDA's unusual incident tracking system does not interface with that of LRA or OIC. D.C. Prelim. Rep. at 29. Information systems between DOH and DHS or that systems within DOH are not standardized. D.C. Prelim. Rep. at 29–30. There is no complete file of the complaints and incidents that occur in an individual facility. D.C. Prelim. Rep. at 30.

55. There is no automated tracking system in place in the District's system to log the unusual incident reports and track action through disposition. It is difficult to track unusual incidents across all involved agencies. D.C. Prelim. Rep. at 30.

56. A lack of investigative powers within OIC and IAD hinders the investigative process. The OIC function is unknown to case managers and vendors who often ask for supervisory clearance before cooperating with an investigation, which delays interviews and document collection and analysis. D.C. Prelim. Rep. at 30.

*SAFEGUARDING PERSONAL POSSESSIONS*

57. MRDDA lacks sufficient internal procedures and automation to accurately account for all funds allocated to client accounts. Customers in the District's system are entitled to personal care allowance of approximately $70.00 per month. Deposits over $50.00 are to be placed in interest bearing accounts and any interest must be credited to that account. After the cost of care allocation is disbursed to providers, MRDDA has no specific procedures in place to ensure that allocations of funding goes directly to the cost of care and personal care. Evidence set forth by a June 1998 DHS audit indicate that at least $73,000.00 is owed to customers. Audits to identify allocations or misuse of funds are disjointed and funds are tracked through agencies that communicate all information through documentary evidence that does not exist in some cases and is not updated in others. Automation between agencies for audit purposes of funds is non-existent and therefore allocations of funds are not able to be tracked or monitored. Budgetary and Financial Analysis of MRDDA, Final Report to Government of the District of Columbia, Office of the City Administrator, Management Analysis, Inc., Jan. 13, 2000 (hereinafter "D.C. MAI Budget Rep.") at 3–6, 7.

58. Community bank accounts are not adequately managed by MRDDA. There is no formal control, monitoring or reporting. MRDDA cannot identify how many such accounts exist, or who has them, how much money is in them, or how they are being managed. MRDDA senior staff and case managers do not have the staff to track these accounts down, and are aware that numerous accounts in the community exist outside the knowledge of MRDDA case managers. D.C. MAI Budget Rep. at 3–9.

59. The District has no controls in place to monitor community bank accounts of clients. D.C. Prelim. Rep. at 37.

60. The District has no controls in place to monitor customer burial accounts. MRDDA has neither procedures for the establishment nor the maintenance of burial accounts and similarly lacks procedures for monitoring or administering any existing accounts. D.C. Prelim. Rep. at 37.

61. There is no mechanism in the District's system to effectively monitor the implementation of individual financial plans. Providers often fail to get approval from case managers before withdrawing funds from individual accounts. The District rarely insists upon receipts from providers indicating what was actually bought with the funds. There are inadequate asset control mechanisms in place so that case managers and others can determine what property customers own. D.C. Prelim. Rep. at 36.

62. MRDDA does not enforce penalties or monitor providers' transactions associated with client accounts. MRDDA has no formal procedures for review of the providers' financial statements except upon the case managers' inspection of the providers' residence or if the provider sends MRDDA a copy of the bank statements. Documentation of client accounts, balances and transactions are not systematically tracked and therefore MRDDA is unable to ascertain providers' compliance with Federal and District regulations or whether funds have been commingled or expended on unauthorized allocations. D.C. MAI Budget Rep. at 3–8.

63. Individual Financial Plans ("IFP's") are not used to manage the disbursement of client funds in the District's system. Because the IFP's serve as general guidelines only, they have little or no relevance in monitoring actual customer expenditures. It would be "impossible" for a case manager to manually review all clients' IFP's to ascertain actual expenditures given the lack of automation and lack of records. D.C. MAI Budget Rep. at 3–8.

64. Clients' individual financial plans are not drafted with sufficient or meaningful detail and the monitoring of these plans is inadequate in the District's system. D.C. Prelim. Rep. at 36.

## QUALITY ASSURANCE PROGRAMS, MONITORING AND CASE MANAGEMENT

65. Not until December 21, 1999, had the District ever undertaken to conduct an operational review of the entire District system of service delivery to persons with mental retardation and developmental disabilities in an attempt to identify system-wide issues. D.C. Prelim. Rep. at 1.

66. The management and oversight of both District employees and private sector providers has been inadequate. D.C. Prelim. Rep. at 2.

67. Communication and coordination occurs on a limited, *ad hoc* basis throughout the District's system. D.C. Prelim. Rep. at 2.

68. In most parts of the District's system, there has been and continues to be a lack of managers with solid management skills and recognized expertise in the mental retardation or developmental disabilities field or other related fields. The common use of acting or temporary managers causes uncertainty in the District's system and inhibits change within the organization, cementing in place antiquated practices. The District's system is unable to move forward without permanent managers in key positions. D.C. Prelim. Rep. at 3.

69. Both District and private sector employees lack the updated position descriptions, training, and supervision that is con-

sistent with an effective service delivery system. D.C. Prelim. Rep. at 3.

70. In many cases, policy and procedure statements are not available in the District's system. In some cases, policies and procedures are not circulated to employees or are so out of date, that they are useless. Informal communication of policies and procedures during "on the job training" has served to continue a system of bad habits and poor methods. D.C. Prelim. Rep. at 3–4.

71. All policies and procedures in the District's system are in need of review and revision. Where policies and procedures do not exist, they need to be created in accordance with updated philosophies, processes, and systems. D.C. Prelim. Rep. at 4.

72. One of the most striking findings of the Defendants' own operational review of the District's system was the complete lack of communication and coordination within the mental retardation and developmental disabilities service delivery system. Each organization within the system operates in nearly complete isolation from the other organizations. This has resulted in total dysfunction of the service system and the complete lack of leadership system-wide. D.C. Prelim. Rep. at 4.

73. Automation is lacking throughout the District's service delivery system. D.C. Prelim. Rep. at 4.

74. In addition to failures at MRDDA, a multitude of governmental agencies and various levels of governmental oversight all contribute to the District's broken service delivery system. Bureaucratic processes hinder cross-agency collaboration. D.C. Prelim. Rep. at 10.

75. DHS has failed to take appropriate actions regarding the provision of services to persons with mental retardation and developmental disabilities. D.C. Prelim. Rep. at 14.

76. Top level DHS management responses to issues concerning service provision and quality of care of its MRDDA customers has been both reactive and inadequate. D.C. Prelim. Rep. at 14–5. Appropriate DHS leadership has been severely lacking in the District's system. D.C. Prelim. Rep. at 15.

77. There has been a dearth of persons with solid managerial skills in key positions at MRDDA for a number of years which has produced general dysfunction within the entire system. D.C. Prelim. Rep. at 15.

78. MRDDA has not had an Administrator with an appropriate technical background in either mental retardation or developmental disabilities for approximately six years. D.C. Prelim. Rep. at 3, 15.

79. Neither the Bureau of Case Management ("BCM") nor the BPOC has a permanent Bureau Chief. D.C. Prelim. Rep. at 15.

80. In some cases, persons holding management positions regarding the intake and case management functions have not ensured the existence of appropriate procedures or the adherence to existing procedures in the District's system. D.C. Prelim. Rep. at 16.

81. Position descriptions for managers in the District's system are outdated and do not appropriately reflect either the correct tasks or newer philosophies regarding persons with mental retardation and developmental disabilities. D.C. Prelim. Rep. at 16.

82. A significant number of MRDDA employees do not have position descriptions suitable for the jobs they perform. D.C. Prelim. Rep. at 16.

83. MRDDA employees have not had adequate supervision. D.C. Prelim. Rep. at 16. Comments in favorable performance

ratings are often inconsistent with such ratings. D.C. Prelim. Rep. at 16–7.

84. There are insufficient numbers of employees to do the work required in the District's system. Monitoring staff is inadequate; there are no staff trained or qualified to create or review draft legislation, procedures or policies; there are no staff specifically charged with tracking compliance with the multiple Court Orders; and there are only two employees charged with making court appearances that occur almost every day. D.C. Prelim. Rep. at 17.

85. There are insufficient numbers of employees in the District's system to do the work required. As an example, a Court Order in the *Evans* case requires a ratio of case managers of no more than 1:60 for *Evans* class members. The District has determined that a more appropriate ratio is 1:30 and is attempting to achieve this ratio for all customers. D.C. Prelim. Rep. at 17. Case management position descriptions should be modified to reflect the best and current practices in the coordination of services. D.C. Georgetown Rep. at 4.

86. There are inadequate methods for background checks on providers and the employees of providers in the District's system. D.C. Prelim. Rep. at 18.

87. MRDDA neither has the statutory nor administrative authority to require the interagency coordination and collaboration necessary across District governmental agencies. D.C. Prelim. Rep. at 19.

88. Case managers do not visit all customers on their caseloads at least once per quarter per MRDDA policy. D.C. Prelim. Rep. at 19.

89. There is no document management policy within MRDDA in spite of the fact that all District agencies are to have one. D.C. Prelim. Rep. at 19.

90. There is a lack of adequate communication within sections of MRDDA, as well as with other District organizations. D.C. Prelim. Rep. at 19–20.

91. There is almost no automation used for the intake and case management functions in the District's system. MRDDA as a whole lacks e-mail. Most processes are paper driven. Case managers record their notes by hand. Unusual incident reports are done by hand. A contractor has been hired to develop databases which should allow MRDDA to track such information as demographics of its customer base, the residence of each customer, the status of Individual Habilitation Plans ("IHP's"), incidents involving customers and providers. In addition, this lack of automation contributes to MRDDA failing to comply with Court Orders. D.C. Prelim. Rep. at 20.

92. The District's MRDDA Monitoring Unit had been dismantled for years, and although it has recently been reestablished, no written policies exist for this unit. D.C. Prelim. Rep. at 23.

93. Two positions that directly affect the administration of LRA (the Director and the Director for State Affairs) are not permanently filled. D.C. Prelim. Rep. at 26.

94. District monitoring functions are understaffed. D.C. Prelim. Rep. at 27.

95. LRA only provides monitoring at the minimum level required by the United States Health Care Financing Administration ("HCFA"). This level of monitoring does not support the mission statement of the District's DOH which seeks to assure safe and healthy environments through licensing and regulation, reducing or preventing the risk of disease, dysfunction and premature death. LRA does not perform enough monitoring of facilities to carry out this mission. D.C. Prelim. Rep. at 28.

96. There is no coordination between the MRDDA monitoring unit and LRA to ensure that inspections performed complement, as opposed to overlap, each other. D.C. Prelim. Rep. at 29.

97. The MRDDA monitoring unit does not have an automated way to track inspections. D.C. Prelim. Rep. at 29.

98. There have been significant delays in the District's system in negotiating and completing contracts for non-Medicaid services, partly due to significant understaffing. D.C. Prelim. Rep. at 32.

99. Medicaid provider agreements and District contracts with providers lack quality controls, effective monitoring provisions, and incentives or disincentives for superior or substandard service. D.C. Prelim. Rep. at 32.

100. Twenty-seven District employees have been detailed or reassigned from Forest Haven to MRDDA since 1991 with no current position descriptions or any formal determination that they possess the skills and training to perform the tasks to which they are now assigned. D.C. Prelim. Rep. at 32–33.

101. Many, if not most, of the positions at MRDDA lack accurate, up-dated position descriptions. MRDDA supervisors need assistance in proper performance evaluation preparation. D.C. Prelim. Rep. at 33.

102. Defendants acknowledge that there is no true system for providing services to MRDDA customers; rather there are a number of agencies that perform functions that impact the MRDD population in relative isolation from each other. D.C. Addendum Rep. at 4.

103. MAA is currently doing no provider reviews to determine if MRDDA customers are receiving the level of care for which MAA is paying. D.C. Addendum Rep. at 4.

104. There is currently no formal procedure that requires coordination between the District of Columbia's Public Schools ("DCPS") and MRDDA when an individual leaves the DCPS system and enters MRDDA's. D.C. Addendum Rep. at 4.

105. There is insufficient staff assigned to conduct utilization reviews to ensure that the appropriate level of care is being provided to customers within the District's system. D.C. Addendum Rep. at 9.

106. Based on Defendants own review, written policies and procedures are lacking in the District's system. While many policies and procedures are established by HCFA, the Defendants' review indicated that MAA has not formulated or disseminated internal written policies and procedures. D.C. Addendum Rep. at 10.

107. Automation in the system is outdated in the District's system. D.C. Addendum Rep. at 10.

108. There is a lack of communication between DCPS divisions and between DCPS and MRDDA. D.C. Addendum Rep. at 11.

109. The position description of the Administrator of MRDDA is obsolete and outdated. D.C. Georgetown Rep. at 17.

110. The District's CMD is understaffed to protect the rights of people with mental retardation and other developmental disabilities. D.C. Georgetown Rep. at 19.

111. The position descriptions for non-licensed MRDDA staff do not cite minimum educational requirements. If MRDDA administrative staff were effectively performing the duties and responsibilities as specified in the position descriptions, the agency would not be experiencing multiple and ongoing crises. A significant proportion of MRDDA's staff is former direct care/service personnel. An analysis of the available forms for these personnel

fails to demonstrate that re-training or continuing education has occurred to provide personnel with the knowledge and competencies required to fulfill current duties and responsibilities. D.C. Georgetown Rep. at 23.

112. In a recent review of performance ratings for MRDDA personnel, a majority had no performance ratings. D.C. Georgetown Rep. at 24.

*BUDGET, TIMELY PAYMENT OF VENDORS*

113. Since 1995, the District's budget allocation for CRF's and other non-Medicaid supported services has been reduced as a result of fiscal crises. These funds have yet to be restored to meet current demands. Adjusted for inflation, total spending for services for individuals with mental retardation and/or developmental disabilities in the District declined 2 percent during 1991–1996; nationally during the same period, total spending for individuals with mental retardation and/or developmental disabilities advanced 24 percent in inflation adjusted terms. D.C. Georgetown Rep. at 14.

114. The District's budget process is not designed to support MRDDA and customer requirements. There is no effective system in place for identifying MRDDA's actual budgetary requirements in terms of District appropriated funds. MRDDA cannot readily identify its current customer demographics and has no projection of future customer demographics. MRDDA does not track, and is unable to identify costs by customer category. D.C. MAI Budget Rep. at 3–1.

115. IHPs are not used as input to project MRDDA resource requirements. The IHPs document the range of services needed by a current customer, and of course, will change over time. Lack of IHP input tends to understate require-

ments since MRDDA's population is aging. D.C. MAI Budget Rep. at 3–2.

116. The budget process begins with the prior year's baseline as the starting point. However, MRDDA has not been providing a fully satisfactory level of service. There are deficiencies in staff training, quality control, case management, and other areas. Yet baseline budgeting tends to perpetuate existing problems and does not provide management with alternatives and associated costs for addressing these issues. Plus, baseline budgeting does not take into account the differential costs of person centered planning or the changing requirements due to changes in the number or mix of clients. D.C. MAI Budget Rep. at 3–1, 3–2.

117. Financial tracking and reporting are not adequate for program management purposes in the District's system. MRDDA has no timely tracking of expenditures and does not have a precise picture of funds available at any given point during the fiscal year. Despite the existence of many urgent requirements, the agency significantly underspent its FY 1999 general fund budget by $2.6 million. D.C. MAI Budget Rep. at 3–2.

118. MRDDA's appropriated budget is not developed based on any real analysis of the expected expenditures of the agency. Instead, the MRDDA appropriated budget, approximately $24 million per year, is based on no more than guesswork and the use of the prior year's appropriations to estimate budgetary needs. This does not allow for an accurate forecast of expected needs that would support rational policy decisions within the budget development process. D.C. Prelim. Rep. at 34.

119. The District does not know what its true cost is to provide services to individual customers, such that attempts to recover cost of care amounts from individual

customers may be inappropriate. D.C. Prelim. Rep. at 36.

120. Fiscal issues have not been appropriately addressed within the District's system. D.C. Prelim. Rep. at 2.

121. The District does not know the total amount expended to operate the MRDDA program and provide services to the client population. D.C. Prelim. Rep. at 34.

122. There is inadequate information exchange between MRDDA and the DHS Chief Financial Officer ("CFO"). D.C. Prelim. Rep. at 34.

123. MRDDA underspent its budget by approximately $2 million or ten percent of MRDDA's appropriated budget (which excluded Medicaid expenses), in part because the DHS CFO and MRDDA failed to communicate about quarterly budgetary forecasts. D.C. Prelim. Rep. at 34.

124. Amounts currently available for case manager trips to visit customers who live outside of the District are insufficient. D.C. Prelim. Rep. at 34.

125. The vendor payment system within the District's system is inadequate and should be redesigned. D.C. Addendum Rep. at 9.

126. Audits of provider cost data are not timely conducted in the District's system. D.C. Addendum Rep. at 9.

127. The total cost of the MRDDA-related programs is not captured by existing financial systems. D.C. MAI Budget Rep. at 3–3.

128. Provider contracts in the District's system are vague and overly broad with no uniform provisions governing the maintenance and custodianship over customer accounts and other property. The lack of specific procedural or contractual guidance, either by incorporation or reference, invites all sorts of abuses, and likely preclude the recovery of any misappropriated funds. D.C. MAI Budget Rep. at 3–9, 3–10.

129. Provider contracts in the District's system lack specific guidance for noncompliance with applicable regulations or contractual terms and afford no means of recourse for breach by the provider. D.C. MAI Budget Rep. at 3–10.

The following Defendants' reports are referenced above:

A. Preliminary Findings on the Mental Retardation and Developmental Disabilities Service Delivery System, Government of the District of Columbia, Office of the Deputy Mayor for Children and Families, Jan. 18, 2000 (Master's Exh. F).

B. Addendum to Preliminary Findings on the Mental Retardation and Developmental Disabilities Service Delivery System, Government of the District of Columbia, Office of the Deputy Mayor for Children and Families, Mar. 2, 2000 (Master's Exh. I).

C. Final Report to the Government of the District of Columbia, Office of the City Administrator, Office of the Deputy Mayor for Operations, Georgetown University Child Development Center, Jan. 18, 2000 (Master's Exh. L).

D. Budgetary and Financial Analysis of MRDDA, Final Report to Government of the District of Columbia, Office of the City Administrator, Management Analysis, Inc., Jan. 13, 2000 (Master's Exh. H).

Reference to the reports listed above are solely for the purpose of establishing the effective dates of the stipulations. Defendants assert that the references to any of the above reports or statements are not intended to infer that the reports or statements are admissions of the Defendants.