# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 24, 2015      Decided August 18, 2015

No. 13-7082

DAVID HARVEY, INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF CURTIS SUGGS,
APPELLEE

v.

DISTRICT OF COLUMBIA,
APPELLANT

———

Consolidated with 13-7090, 13-7101, 13-7111

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:02-cv-02476)

———

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellant. With him on the briefs were *Irvin B. Nathan*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. Alikhan*, Deputy

Solicitor General.  *Mary L. Wilson*, Assistant Attorney General, entered an appearance.

    *Marc Fielder* argued the cause for appellee.  With him on the brief was *Harvey S. Williams*.

    Before: GRIFFITH and SRINIVASAN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

    Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

    SENTELLE, *Senior Circuit Judge*:  Curtis Suggs died while residing in a group home operated by District of Columbia contractor, Symbral Foundation for Community Services, Inc.  David Harvey, as personal representative of the estate of Suggs, brought suit against the District, Symbral, and Symbral's owners, Leon and Yvonne Mohammed, asserting violations under 42 U.S.C. § 1983, federal law regulating community residential facilities, and the common law.  The district court granted summary judgment to Harvey against the District on the § 1983 claim and negligence claims, and against Symbral and the Mohammeds for negligence.  *Harvey v. Mohammed* ("*Harvey I*"), 841 F. Supp. 2d 164, 177, 186–89 (D.D.C. 2012).  The district court also held as a matter of law that the District was liable under D.C. Code § 7-1305.05(g).  Symbral and the Mohammeds settled before a jury trial on damages against the District.  After verdict, the court entered judgment against the District for $2.65 million.  The District moved for a new trial.  The court denied the motion. *Harvey v. Mohammed* ("*Harvey II*"), 941 F. Supp. 2d 93, 99–100 (D.D.C. 2013).  The District appeals, assigning as error the grant of summary judgment and the denial of its post-trial motion.  We affirm the judgment as to liability.  As to damages, because the district court erred in excluding

causation evidence, we vacate and remand for reconsideration.

## I.    BACKGROUND

Curtis Suggs was severely disabled.  He was diagnosed with profound cognitive and adaptive intellectual disabilities, cerebral palsy, controlled seizure disorder, scoliosis, presbyopia, hearing loss, and urinary incontinence.  As an adult, he had approximately the functional capacity of a two-year-old child.  While he could feed himself, use the bathroom, and walk, he was unable to wash or dress himself, and required constant care and supervision.

After the death of his parents, Suggs lived with his sister, Carrie Weaver.  In 1967, Weaver petitioned the district court to have Suggs committed to the District's custody because his family could no longer care for him.  Under a 1925 Act governing commitment of intellectually disabled individuals, the district court found Suggs to be "feeble-minded," "incapable of managing his affairs," and a "fit subject for commitment to and treatment at the District Training School," and ordered him committed to the District's custody.  *Harvey I*, 841 F. Supp. 2d at 171; *see* An Act to provide for commitments to, maintenance in, and discharges from the District Training School, and for other purposes, Pub. L. No. 68-578, 43 Stat. 1135 (1925).

Following his commitment, Suggs resided at Forest Haven, a District institution for the mentally disabled.  In 1976, Suggs was part of a class action lawsuit alleging various constitutional violations arising from poor conditions at the facility.  The District agreed via consent judgment to close Forest Haven and place all of its residents in "community living arrangements."  *Evans v. Williams*, 206 F.3d 1292, 1293 (D.C. Cir. 2000).  The District also enacted

the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, establishing the Mental Retardation and Developmental Disabilities Administration ("MRDDA") as the District agency responsible for the care and habilitation of persons legally committed to its custody. *Harvey I*, 841 F. Supp. 2d at 171. In 1984, the District placed Suggs at a group home operated by Symbral, where he resided until his death in 2000.

As the district court explained, "[a]lthough MRDDA contractually delegated the day-to-day responsibility for the care and habilitation" of Suggs to Symbral, "MRDDA remained the agency legally responsible for Mr. Suggs." *Id.*

> . . . Mr. Suggs's MRDDA case manager was responsible for overseeing all of the components of Mr. Suggs's individual habilitation plan ("IHP"), a written plan which detailed his strengths, weaknesses, and goals based on assessments by therapists, clinicians, and other health care professionals. The IHP is developed by the Inter–Disciplinary Team ("IDT") comprised of clinicians such as a nurse, a speech and language pathologist, physical and occupational therapists, the MRDDA case manager, and the Symbral [qualified mental retardation professional]. Mr. Suggs's MRDDA case manager was required to coordinate and monitor the IHP and was responsible for approving the IHP document. Additionally, the case manager was responsible for following up on medical recommendations made in the IHP to ensure that Mr. Suggs received those services. If Mr. Suggs was not receiving services in accordance with his IHP, the case manager was expected to inform Symbral and the case manager's supervisor. Mr. Suggs's MRDDA case manager was

required to visit him at least four times per year to carry out these responsibilities.

*Id.*

In 1994, Suggs's IHP reported that he was in good health and could feed himself, stand with support, and respond to communication from his peers. Beginning in 1995, he experienced a decline in motor function. The 1995 and 1996 IHPs for Suggs stated that he lost strength in his upper extremities, depended on staff to feed him, and became incontinent. In September 1995, his physical therapist noted this deterioration and recommended a neurology consultation to explore the cause. *Id.* On March 5, 1996, Suggs's MRDDA case manager, Sarah Jenkins, met with the Inter-Disciplinary Team for Suggs at Symbral and noted the recommendation by the physical therapist for a neurology consultation. Neither Jenkins nor the Team included the recommendation for the neurology consultation in Suggs's 1996 IHP, despite acknowledging his loss of motor function and his inability to feed himself. *Id.*

On February 20, 1997, the Healthcare Finance Administration issued a deficiency notice to Symbral for failing to promptly schedule the consult in 1995. The surveyor issued the Deficiency Notice to Yvonne Mohammed, who signed a Plan of Correction stating that Symbral would "make all medical appointments within one month of the recommendation." *Id.* That same day, Mohammed scheduled a neurology appointment for Suggs.

On March 7, 1997, Georgetown Neurologist Kenneth Plotkin examined Suggs. Dr. Plotkin thought that cervical stenosis (compression of the cervical spine) could be the cause of Suggs's decreased ability to use his upper

extremities, and recommended that an MRI be taken of Suggs's cervical spine as soon as possible. Dr. Plotkin reiterated this warning again on April 1, 1997. On April 18, 1997, Georgetown Hospital conducted the requested MRI. The MRI showed severe spinal stenosis at the C-2 level of Suggs's spine.

Dr. Plotkin ordered a follow-up appointment for May 1, 1997, but Symbral did not schedule an appointment until June 27, 1997. At that follow-up visit, Dr. Plotkin recommended that Suggs be examined by a neurosurgeon to determine whether surgery could prevent further loss of function. As of September 1997, Symbral had yet to schedule the recommended consultation.

Finally, in November 1997, neurosurgeon Dr. Fraser Henderson examined Suggs and recommended that he receive a laminectomy "in the next few weeks" to relieve pressure on the spinal cord. On December 16, 1997, Dr. Plotkin wrote Symbral and "recommended proceeding with the C-1-3 laminectomy as per Dr. Henderson to be scheduled ASAP." Instead of proceeding with the laminectomy, Suggs's Inter-Disciplinary Team waited four months, then decided on March 19, 1998, to take Suggs in for a second opinion. Suggs's team did not seek the second opinion regarding the neck surgery until April 1999, despite taking Suggs to two separate neurology visits at Howard University Hospital. Not surprisingly, Dr. Mills at Howard University recommended the surgery at the April appointment. Still, Suggs never received the laminectomy. In December 1999, a neurosurgeon at Providence Hospital concluded that surgery was unlikely to meaningfully improve Suggs's motor function or neurological status.

Suggs's cervical compression gradually caused him to experience a decline in motor function until he could no longer feed himself, chew his food, or walk. He suffered from frequent incontinence, dehydration, and decubitus ulcers. Eventually, his diaphragm became paralyzed, which led to his inability to breathe and his death on June 20, 2000.

Following Suggs's death, Harvey brought a suit for damages on behalf of Suggs's estate against Symbral, Leon and Yvonne Mohammed, and the District. The complaint alleged numerous counts against the various defendants on various theories of negligence and breach of fiduciary duty. The other defendants no longer being party to the lawsuit, only those claims asserted against the District are before us. As remains relevant to this appeal, the complaint alleged and the district court entered judgment on claims against the District for violation of Suggs's constitutional rights, specifically, his right to due process under the Fifth Amendment; common law negligence against the District; and a statutory claim against the District under D.C. Code § 7-1305.14(c). The district court granted summary judgment to Harvey on his Fifth Amendment claim against the District; his negligence claims against the District, Symbral, and the Mohammeds; and his statutory claim against the District under D.C. Code § 7-1305.14(c). *Harvey I*, 841 F. Supp. 2d at 177–79, 186–90; *Harvey v. Mohammed* ("*Harvey III*"), 951 F. Supp. 2d 47, 53 (D.D.C. 2013). Symbral and the Mohammeds settled with Harvey before trial on damages. The jury entered a verdict awarding Harvey $2.9 million, of which $500,000 was for the amount of suffering Suggs experienced between December 23, 1999 and June 30, 2000. The district court, finding that the $500,000 amount represented the money to which Harvey was entitled under his negligence and statutory claims, allowed for contribution on that element of damages and entered judgment against the

District for $2.65 million. The court then awarded Harvey roughly $1.2 million in attorney fees and costs under 42 U.S.C. § 1988. *Harvey III*, 951 F. Supp. 2d at 52.[1]

## II. ANALYSIS

On appeal, the District raises multiple assignments of error. First, the District argues that the district court erred in granting summary judgment to Harvey on his § 1983 claim. Second, the District asserts it is entitled to summary judgment on Harvey's negligence and statutory claims because Harvey failed to give the District adequate notice of his claims under D.C. Code § 12-309. Lastly, the District contends that the court abused its discretion in excluding evidence that the District's actions did not proximately cause Suggs's health decline. After reviewing the record of the case and considering the arguments of the parties, we conclude that the district court did not err in entering summary judgment against the District on Harvey's § 1983 claim, and we affirm that portion of the decision on review. We reverse the district court's grant of summary judgment to Harvey on his negligence and statutory claims, concluding that those claims are barred under D.C. Code § 12-309. Because the district court abused its discretion by excluding causation evidence, we vacate the damages and remand for reconsideration.

### A. Harvey's § 1983 Claim

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material

---

[1] Harvey cross appealed the district court's award of attorney fees, arguing that the district court made several computational errors and that he was entitled to an additional $67,965.13 in fees. When asked about this claim at oral argument, Harvey informed the Court that he was withdrawing the appeal. *See* Oral Arg. Recording 28:56–29:10.

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the court must view all facts, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). We review the district court's grant of summary judgment *de novo*. *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1074 (D.C. Cir. 2014).

In this case, the district court entered summary judgment against the District on Harvey's claim that the District violated Suggs's substantive due process rights by acting with deliberate indifference towards Suggs's serious medical needs.

To sustain a claim against a municipality under § 1983, a plaintiff must show that the policy or custom of the municipality caused a violation of the plaintiff's constitutional rights. *Monell v. Department of Social Srvs. of New York*, 436 U.S. 658, 694–95 (1978); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). More specifically, in this case, Harvey must establish: (1) "a predicate claim of deliberate indifference by [District] officials to [Suggs's] serious medical needs" in violation of his Due Process rights; and (2) "that a policy or custom of the District of Columbia caused" that constitutional violation. *Baker*, 326 F.3d at 1306.

The Supreme Court has historically been "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). To constitute a substantive due process violation, the defendant official's behavior must be "so egregious, so outrageous, that it may

fairly be said to shock the contemporary conscience." *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). As the Supreme Court has frequently reminded us, the due process right "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 202 (1989). We must first determine precisely what constitutional right has allegedly been violated. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *Estate of Phillips*, 455 F.3d at 403 ("It is therefore important . . . to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake . . . ." (internal quotations omitted)). Harvey asserts that Suggs had a right as an involuntarily committed mental patient to all necessary medical treatment.

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196. However, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself," "the Constitution imposes upon the State affirmative duties of care and protection with respect to" that individual. *Id.* at 198, 200. In other words, when the State "enter[s] into 'certain special relationships' with the person," the government has a "due process obligation to attend to his medical needs." *Harris v. District of Columbia*, 932 F.2d 10, 13–14 (D.C. Cir. 1991) (quoting *DeShaney*, 489 U.S. at 197). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation

which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.

When the state has a heightened obligation toward an individual, "governmental 'deliberate indifference' will shock the conscience sufficiently" to establish a substantive due process violation. *Smith*, 413 F.3d at 93. Therefore, to prevail on the due process claim, Harvey was required to show that the District had such a "special relationship" with Suggs and that while in that special relationship, the District acted with deliberate indifference to his medical needs. He was then required to show, under *Monell*, that the violation of Suggs's rights was the result of a governmental policy or custom of the District. We affirm the district court's conclusion in granting summary judgment that Harvey has in fact established those elements.

### 1. The District Owed a Duty to Suggs

In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court held that the State has an affirmative duty to ensure the safety and general well-being of an involuntarily committed mental patient. *Id.* at 315–16. This affirmative duty includes the duty to provide necessary medical care. *See Harris*, 932 F.2d at 14. The District involuntarily committed Suggs to its care, and thus, under *Youngberg*, entered into a special relationship with Suggs. Under the District's revised statutory scheme governing the commitment of intellectually disabled individuals, a parent or guardian of an intellectually disabled individual may file a petition with the superior court to have the individual "committed to a facility." D.C. Code § 6-1924 (1978). Under that statute, "commitment" means the "placement in a facility, pursuant to a court order, of an individual who is at least moderately mentally retarded at the request of the individual's parent or guardian *without the*

*consent of the individual*." D.C. Code § 6-1902(4) (1978) (emphasis added).

The District does not dispute that Suggs was involuntarily committed to its care, or that it owed an affirmative duty to Suggs while he resided at Forest Haven. *See* District's Br. 32–33 (acknowledging mental patients are entitled to substantive due process rights when confined to a "state institution"); *Evans v. Washington*, 459 F. Supp. 483, 484 (D.D.C. 1978) (entering into consent order stipulating that the "residents of Forest Haven . . . have a federal constitutional right to habilitative care and treatment based upon the Due Process Clause of the Fifth Amendment"). Rather, the District argues that once Suggs left Forest Haven and moved into a private home, it was no longer in a special relationship with him. It argues that while living in the group home operated by Symbral, Suggs was in the "least restrictive conditions necessary to achieve the purposes of habilitation," D.C. Code § 7-1305.03, such that it no longer deprived Suggs of his liberty in a manner giving rise to a special relationship. We disagree.

Suggs's circumstance parallels the situation we addressed in *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005). In *Smith*, we considered whether the District owed a heightened obligation toward a juvenile delinquent whom the District had placed with a private company that operated "independent living" programs for delinquent youth. *Id.* at 89–90. The District insisted it owed no obligation to the juvenile because his "liberty was unconstricted": subject to program rules, he could "come and go" and "take [program-approved] weekend home visits." *Id.* at 94. We rejected this argument, noting that "such flexibility hardly amounts to freedom from state restraints." *Id.* We held that, even if the juvenile was subject only to the "lesser" of several restrictive

options, he was still being held "against his will," and the District had a heightened duty to assume some responsibility for his well-being. *Id.* at 94–95.

Similarly, the fact that Suggs was held in the least restrictive setting does not negate the involuntary nature of his commitment or the District's duty under *Youngberg* to ensure he received adequate medical care. *See DeShaney*, 489 U.S. at 199–200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

## 2. The District Was Deliberately Indifferent to Suggs's Needs

Harvey suggests the district court erred when it applied the subjective indifference standard from *Farmer v. Brennan*, 511 U.S. 825 (1994), because that case involved a convicted inmate. In his view, individuals like Suggs "'who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" Harvey's Br. 38 (quoting *Youngberg*, 457 U.S. at 321–22). When considering whether the denial of treatment to an involuntarily committed patient violated due process, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Youngberg*, 457 U.S. at 323; *see also Patten v. Nichols*, 274 F.3d 829, 842 (4th Cir. 2001) (applying the *Youngberg* standard to an involuntarily committed patient's claim that his due process rights were violated). *But see Chapman v. Keltner*, 241 F.3d 842, 845

(7th Cir. 2001) (applying the deliberate indifference standard to a denial-of-medical care claim asserted by a pretrial detainee). We need not decide that issue as Harvey prevails even under the deliberate indifference standard.

To establish a constitutional violation under that standard, Harvey must show that the District was deliberately indifferent to Suggs's serious medical needs. An official is deliberately indifferent when she has "subjective knowledge of the [plaintiff's] serious medical need and recklessly disregard[s] the excessive risk to [his] health or safety from that risk." *Baker*, 326 F.3d at 1306. The District does not dispute that Suggs's MRDDA case manager, Jenkins, was a District official. *See* District's Reply Br. 1.

The evidence establishes that Jenkins knew of Suggs's medical needs and recklessly disregarded an excessive risk to Suggs's health. The record shows that, as of March 1996, Jenkins was aware that Suggs was experiencing a rapid decline in motor function, that he was no longer able to feed himself, and that his physical therapist recommended he receive a neurology consultation to determine the cause of the deterioration. Yet she neither noted this recommendation in Suggs's IHP, nor took necessary steps to ensure that Suggs visited a neurologist. It was only after the Healthcare Finance Administration issued a deficiency notice to Symbral for failing to promptly schedule the recommended appointment that Suggs finally met with a neurologist in March 1997, at least one year after Jenkins learned of the recommendation.

Jenkins's failure to ensure that Suggs received all necessary medical treatment continued. On March 7, 1997, the neurologist recommended that Suggs get an MRI "ASAP." Suggs did not get an MRI until April 18, 1997, 43 days after the recommendation. The neurologist then

requested that Suggs schedule a follow-up appointment for May 1, 1997. Symbral did not bring Suggs back to the neurologist until June 27, 1997, 58 days after the request. At that meeting, the neurologist recommended that Suggs visit a neurosurgeon to determine whether surgery was a viable option. The appointment with the neurosurgeon did not occur until November 11, 1997, 138 days after the request. At the appointment, the neurosurgeon recommended that Suggs receive a laminectomy "in the next few weeks." The neurologist reiterated that the surgery needed to "be scheduled ASAP." However, Suggs's team, which included Jenkins, waited four months and then decided to get a second opinion. Suggs was not taken to the doctor for a second opinion until April 30, 1999, 408 days after the team decided to seek a second opinion and 536 days after the first neurosurgeon recommended that surgery be performed in a few weeks. Predictably, the second neurologist recommended that Suggs get a laminectomy. Predictably, Suggs never received the surgery.

In short, Jenkins repeatedly failed to monitor Suggs's care and ensure that he was receiving necessary medical treatment. We conclude that under these facts Jenkins acted with deliberate indifference toward Suggs's medical needs in violation of his substantive due process right to receive necessary medical treatment.

### 3. The District's Custom Caused the Constitutional Violation

We next determine whether a District custom or policy caused the violation of Suggs's constitutional rights. Harvey may establish such causation by showing that a District policymaker's ignoring of a practice was "consistent enough to constitute custom." *Warren v. District of Columbia*, 353

F.3d 36, 39 (D.C. Cir. 2004). Or he may show that the District responded to a need "in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Id*. (quoting *Baker*, 326 F.3d at 1306). The "deliberate indifference" standard for establishing a municipal policy is distinct from that required to show an underlying constitutional violation. It is an objective standard, "determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, but did not act." *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011) (internal quotation marks omitted). Only if a municipal policy was "so likely to result in the violation of constitutional rights," and the need to change the policy "so obvious," could "policymakers of the city . . . have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

The District maintains that the district court erred in granting summary judgment to Harvey because he failed to show that it is the District's policy or custom to subject those enrolled within its development disability programs to constitutional violations. We disagree.

The District has a longstanding practice of deliberate disregard of the medical needs of involuntarily committed mental patients. In 2000, the District, in litigation stemming from the 1976 class action by Forest Haven residents, admitted that its "system of support for individuals with developmental disabilities . . . represent[s] one of the most serious breakdowns in the District government over the last two decades." *Evans v. Williams*, 139 F. Supp. 2d 79, 96 (D.D.C. 2001). It acknowledged that it "fundamentally failed its obligation to disabled persons," and that its programs were "highly dysfunctional" and "seriously broken." *Id.* at 97–98.

The District was aware of these failures, but did not act. In 1996, a federal district court found that the District had, "for over two years, chronically and unapologetically violated" its agreement to ensure that the needs of the intellectually disabled are met. *Evans v. Barry*, No. 76-cv-293, 1996 WL 451054, at \*2 (D.D.C. Aug. 2, 1996). In 1997, a court monitor found that *Evans* class members "are frequently denied necessary health services and/or adaptive equipment, sometimes resulting in physical injury." Report to the United States District Court for the District of Columbia, *Evans v. Barry*, No. 76-0293 (Oct. 1, 1999), Joint Appendix 381. The District has acknowledged it was "aware of problems of poor care provided at group homes" and its "systemic failures." *Evans*, 139 F. Supp. 2d at 97.

The District argues that the legislature's enactment of the intellectual disabilities rights statute in 1979 is sufficient to rebut evidence that it had a policy of deliberate indifference. The District's statutory policy is of "little value," where, as in this case, "there is evidence . . . that the municipality was deliberately indifferent to the policy's violation." *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000). In the absence of evidence of actual enforcement of its paper policy, the District has failed to create an issue of triable fact.

The District also argues that while it was aware of systemic failures in its care for the intellectually disabled, it was not aware that these failures "could lead to threats to the life and safety of disabled individuals." *Evans*, 139 F. Supp. 2d at 97. Regardless of whether the District had actual knowledge of constitutional violations, the evidence establishes that the District should have known that its policy of deliberate indifference was likely to result in the violation of rights of the committed person. As noted above, in 1996, a federal district court warned the District that intellectually

disabled individuals are "ill-equipped" to "defend against the city's failure to assist their care providers in giving them the care and treatment they desperately need." *Evans v. Barry*, 1996 WL 451054, at \*2. The District's own compliance monitor warned that class members are "physical[ly] injur[ed]" because of the denial of health care services.

The evidence shows that the District knew that its "entire mental retardation and developmental disabilities system was fundamentally unable to deliver even the most basic services," *Evans v. Williams*, 139 F. Supp. 2d at 97, but did not act to cure the problem. Under these facts, we conclude that the District had a custom or policy of deliberate indifference to the needs of the intellectually disabled, and that this policy caused the violation of Suggs's constitutional rights.

\* \* \*

Harvey has shown that Suggs's substantive due process rights were violated as a result of the District's custom of deliberate indifference. The District has failed to present evidence creating a triable issue of fact regarding its § 1983 liability. We therefore affirm the district court's grant of summary judgment to Harvey on his § 1983 claim against the District.

### B.     Harvey's Negligence and Statutory Claims

The District argues that the district court erred in finding it liable as a matter of law under a common law theory of negligence as well as D.C. Code § 7-1305.05(g) because Harvey's failure to comply with D.C. Code § 12-309 bars those claims. Specifically, the District claims that the notices Harvey filed under § 12-309 were inadequate and untimely.

D.C. Code Section 12-309 provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

Section 12-309 "imposes a notice requirement on everyone with a tort claim against the District of Columbia." *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995). Compliance with the statute is mandatory for filing suit against the District. *Brown v. District of Columbia*, 853 A.2d 733, 736 (D.C. 2004). The § 12-309 clock starts "the instant an injury or damage is sustained." *Id.* at 737. The statute does not allow for tolling. *Dunmore*, 662 A.2d at 1360–61. Section 12-309 applies to District of Columbia statutory causes of actions as well as common law claims. *Giardino v. District of Columbia*, 505 F. Supp. 2d. 117, 120–21 (D.D.C. 2007). It does not apply to Harvey's § 1983 claim. *Brown v. United States*, 742 F.2d 1498, 1500 (D.C. Cir. 1984) (en banc).

Harvey filed notice letters with the Mayor's office on June 16, 2000, and June 23, 2000, alleging that District employees negligently monitored Suggs causing him to suffer from various medical complications. Therefore, if Suggs sustained an injury on or after December 23, 1999, a date six months prior to the first notice, the notice was timely. If he

sustained an injury before December 23, 1999, the notice was untimely, and we must dismiss his negligence and statutory claims. Thus, to determine whether Harvey's notices were timely under § 12-309, we must first determine when Suggs sustained an injury or damage. For guidance, we look to District of Columbia Court of Appeals's precedent, whose interpretation of the substantive law of the District is binding on us. *Payne v. District of Columbia Gov't*, 722 F.3d 345, 353 (D.C. Cir. 2013).

In *Brown v. District of Columbia*, the District of Columbia Court of Appeals addressed the question of when the § 12-309 notice period begins to run where a claimant sues the District for "failing to diagnose a medical condition." 853 A.2d at 737. The Court reasoned that because "patients in [failure to diagnose] cases generally suffer from an ailment when they first seek treatment," the injury, for § 12-309 purposes, "is the worsening or deterioration of the plaintiff's condition." *Id.* at 739. Harvey's negligent treatment claim is similar to a failure to diagnose claim in that the patient suffers from the ailment before the negligent conduct occurred. And so, consistent with *Brown*, we conclude that Suggs sustained an injury, and thus the § 12-309 clock began to run, when Suggs's condition worsened.

Based on our examination of the record, Suggs's condition worsened, and he therefore sustained an injury, prior to December 23, 1999, and his statutory and negligence claims are barred under § 12-309. Suggs's 1994 IHP noted that he "feeds himself independently with a spoon," is able to dress himself with physical assistance, and "is independent in using an empty urinal." By contrast, his 1996 IHP states that he "depends on staff for feeding," "for all functional dressing," and for "help with toileting." He also wore "depends due to incontinence." His 1997 IHP notes that he

"continues to regress physically." By December 1998, he suffered from "reduced oral motor skills" and a "lack of chewing skills," resulting in malnutrition and dehydration. One year later, on December 2, 1999, Suggs had a skin flap surgery to address the pressure ulcers that had developed on his body as a result of his lack of mobility. We cannot state with medical certainty the exact date on which Suggs's untreated condition worsened. At a minimum, Suggs's condition had worsened by December 2, 1999, the date of his skin flap surgery and a date more than six months before Harvey filed his first § 12-309 notice. We therefore conclude that Harvey's statutory and negligence claims are barred under D.C. Code § 12-309.

Our conclusion regarding the statutory and negligence claims ultimately makes no difference in the judgment. The verdict form submitted to the jury posed two questions. First, "[w]hat amount of money do you find would fairly and adequately compensate Curtis Suggs for the injuries and damages he suffered as a result of the District of Columbia's deliberate indifference to Mr. Suggs's medical needs?" The jury answered, "$2,900,000." Second, "[o]ut of that total sum for injuries and damages, what amount is for the suffering of Curtis Suggs between December 23, 1999 and June 30, 2000." The jury responded, "$500,000." In its order granting in part and denying in part the District's motion for contribution, the district court noted that the "$500,000 amount was found by the jury to arise from the District's common law negligence," as well as Harvey's statutory claim. Memorandum and Order, *Harvey v. Mohammed*, No. 02-2476 (D.D.C. Aug. 16, 2012), Joint Appendix 1039. Elsewhere in the order, the district court made clear that the damages for the negligence claim "are a sub-part of the total damages to be awarded to plaintiff under § 1983 because the District's negligence and the District's deliberate indifference ran

concurrently." *Id.* at Joint Appendix 1038. That, of course, is exactly what the jury verdict provided.

The total damages were $2.9 million. Five hundred thousand of that figure represented the damages incurred during a distinct period covered by the District's common law and statutory tort liability, as well as the constitutional tort. Nonetheless, as the district court recognized, even absent the common law and statutory claims, the District was still liable for the total figure because of its § 1983 liability. The second jury question was relevant only to whether the District would receive contribution. That question, of course, has been settled already. Setting aside the contribution question, the second response on the jury verdict form is no longer relevant. The District owes the full amount under question one because of its constitutional torts. We can therefore affirm the judgment as it stands. It is well established that "in cases on appeal from the district court, we are to review 'judgments, not opinions.'" *People's Mojahedin Organization of Iran v. U.S. Dept. of State*, 182 F.3d 17, 23 n.7 (D.C. Cir. 1999) (quoting *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)). The judgment entered by the district court is not dependent upon the grounds to which it is assigned; therefore, as we uphold one adequate ground, any error as to alternative theories is immaterial.

## C. Causation Evidence

The District claims that the district court erred in excluding its evidence contesting whether Suggs's health decline was due to the District's deliberate indifference. At trial, the District sought to admit the expert testimony of (1) Dr. Slvanus Ayeni, who planned to testify that, at the time he examined Suggs, he would not have benefitted from a

laminectomy; (2) the testimony of Kachen Alsopp, who planned to testify to the causes of Suggs's condition; (3) Senora Simpson, who planned to testify that Suggs's physical deterioration was related to cerebral palsy and his age; and (4) Dr. David Jackson, who planned to testify that, due to Suggs's health issues, he would have suffered more had he had a laminectomy. Defendant District of Columbia's Supplement to Joint Pretrial Statement at 1–2, *Harvey v. Mohammed*, No. 1:02-cv-2476 (D.D.C. Mar. 30, 2012), Joint Appendix 753–54; Joint Pretrial Statement at 17, *Harvey v. Mohammed*, No. 1:02-cv-2476 (D.D.C. Mar. 13, 2012), Joint Appendix 713. The District also sought to admit the opinion testimony of Dr. Gersh, Suggs's treating physician, as well as evidence that it contacted Suggs's sister to obtain consent for surgery and that Symbral's negligence was an intervening cause of Suggs's pressure sores.

The district court excluded all the proffered evidence. First, the district court excluded the testimony of Dr. Ayeni, Alsopp, and Simpson for failure to comply with Federal Rule of Civil Procedure 26(a)(2) (governing the disclosure of expert testimony). Supplemental Pretrial Order, *Harvey v. Mohammed*, No. 1:02-cv-2476 (D.D.C. Apr. 5, 2012). The district court excluded the testimony of Dr. Jackson as irrelevant. *Id.* It later explained that evidence supporting the theory that the laminectomy would have caused Suggs more harm than good had no bearing upon the "sole remaining issue of damages." *Harvey II*, 941 F. Supp. 2d at 98. The district court reasoned that in its summary judgment order, it concluded "that the District's conduct had caused Mr. Suggs's injuries," and the District "was not allowed to relitigate liability at trial." *Id.* at 99. The district court also excluded the testimony of Dr. Gersh based on the District's failure to comply with Federal Rule of Civil Procedure 26(a)(2)(C). *Id.* at 100. Before the 2010 Amendments to the Rules, Rule

26(a)(2) allowed a party to name a treating physician as the party would name any other witness, that is the party did not need to provide the opposing side with the subject matter of the testimony and a summary of the facts and opinions to which the treating physician was expected to testify. Fed. R. Civ. P. 26, Advisory Comm. nn. After the amendments, however, the Rule required such disclosures. Fed. R. Civ. P. 26(a)(2)(C). Although Federal Rule of Civil Procedure 26(a)(2) was not in effect in its current form when the District initially made its disclosures, the district court noted that "the Rule went into effect before the close of discovery and the District in fact complied with [the Rule] with respect to another potential expert witness." *Harvey II*, 941 F. Supp. 2d at 100. Thus, the district court concluded that the District's failure to comply with Rule 26(a)(2) was not "substantially justified" or "harmless," and it excluded the evidence. *Id.* Lastly, the district court excluded evidence that Symbral's negligence was an intervening cause of Suggs's pressure sores as irrelevant.

On appeal, the District challenges the district court's exclusion of the testimony of Dr. Jackson and Dr. Gersh, as well as the court's exclusion of evidence that (1) Suggs's health decline was attributable in part to his pre-existing cerebral palsy and scoliosis; (2) Ms. Weaver, Suggs's sister, refused to consent to the laminectomy, thereby severing the causal chain; and (3) Symbral's negligence was an intervening cause for Suggs's pressure sores.

We review a district court's evidentiary rulings for abuse of discretion. *Huthnance v. District of Columbia*, 722 F.3d 371, 377 (D.C. Cir. 2013). We will reverse an erroneous evidentiary ruling only if the effort affects a party's substantial rights. *Id.*

The district court did not abuse its discretion in excluding the testimony of Dr. Jackson. The District argues that Dr. Jackson's testimony that Suggs would have suffered had he received the neck surgery is relevant because Suggs's recovery for pain and suffering should be offset by the amount of pain he would have experienced had he gotten the surgery. To support this proposition, the District cites *Hamilan Corp. v. O'Neill*, 273 F.2d 89 (D.C. Cir. 1959). *Hamilan Corp.* does not support the District's argument. In that case, we affirmed a jury instruction stating that a plaintiff who suffers secondary injuries which proximately cause emotional disabilities may recover damages for such emotional disabilities as long as they "stem from the original physical injury in an unbroken chain of causation." *Id.* at 91. In this case, the district court found that Harvey "submitted substantial evidence on summary judgment demonstrating a causal connection between the District's failure to properly supervise the provision of medical care to Mr. Suggs for his cervical stenosis, the resulting precipitous decline in Mr. Suggs's health, and his ultimate death." Pretrial Order, *Harvey v. Mohammed*, No. 02-cv-2476 (D.D.C. Mar. 22, 2012). A plaintiff is entitled to "recover money damages for any injuries [he] suffered *as a result of* the . . . violation." *Halperin v. Kissinger*, 606 F.2d 1192, 1207 (D.C. Cir. 1979) (emphasis added). The District does not explain how Dr. Jackson's evidence negates the injuries Suggs suffered as a result of the District's deliberate indifference. That Suggs might have suffered had he gotten the surgery is irrelevant to the question of how much he suffered (and the amount of damages to which he is entitled) because he did not get the surgery. Dr. Jackson's testimony was properly excluded.

Next, the district court did not abuse its discretion in excluding the testimony of Dr. Gersh. Discovery in this case closed on June 30, 2011, six months after the 2010

Amendments went into effect. *Harvey II*, 941 F. Supp. 2d at 100. The District offers no excuse for failing to comply with the amended rules. Moreover, as late as March 30, 2012, one week before trial, the District sought to add six late-named witnesses and it still failed to designate Gersh as an expert. *Id.* The District did not put forth any reason for this failure. Under Federal Rule of Civil Procedure 37, "[i]f a party fails to provide information or identify a witness required by Rule 26(a) . . . the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The district court found that the District's failure was not "substantially justified" or "harmless." Under these facts, the district court did not abuse its discretion.

However, the district court abused its discretion in excluding evidence that Suggs's decline was at least partially attributable to his pre-existing medical conditions. That evidence is relevant to the question of damages, and the District contends that it should have been allowed to cross-examine Harvey's experts about whether Suggs's pre-existing conditions were independent factors contributing to his decline. We agree with the District because "the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). The district court abused its discretion by not allowing the District to contest damages by presenting evidence that Suggs's decline in health could at least partially be attributed to pre-existing medical conditions.

Harvey points out that the district court nevertheless allowed the District to cross-examine an expert on alternative causes of Suggs's health problems. Specifically, the District elicited from Harvey's expert Dr. Sandhu the admission that

"it's hard to know how much [of Suggs's decline] is, you know, from their cerebral palsy versus something new," Tr. Transcript 153:16–19 (Apr. 11, 2012), a fact that the District emphasized at closing argument, Tr. Transcript 27:5–28:8 (Apr. 18, 2012) ("[T]here's a lot of evidence in this case which shows that things that Mr. Suggs had were actually related to the cerebral palsy and were not related to the cervical stenosis. For example, Dr. Sandhu, in cross-examination, testified that curvature of the spine, scoliosis, and he had kyphosis, which meant it was curved forward, and scoliosis, which meant it was curved to the side, causes problems breathing. That is what caused his respiratory problems. That was part of his testimony."). Yet the district court did not allow the District to challenge Dr. Citrin on cross examination with similar questions about Suggs's pre-existing medical conditions. We therefore reject Harvey's argument.

The district court abused its discretion in excluding evidence that Suggs's sister refused to consent to the laminectomy. The District argued that the refusal to consent broke the chain of causation for damages, but the district court rejected that argument because "the District could have consented and simply was indifferent to consenting and did not consent." Tr. Transcript 124:23–25 (Apr. 10, 2012). Even though the administrator of MRDDA, as Suggs's legal guardian, could have consented to the surgery, it is at least possible that Suggs's sister, as an adult sibling, had the authority to "refuse or withdraw consent." D.C. Code § 21-2210(a). If the District could show that Suggs's sister had the authority to refuse to consent to the surgery and did so here, then any damages stemming from the failure to get the surgery after that point might not be attributable to the District. That evidence should be presented to the jury.

Lastly, the district court did not err in excluding evidence that Symbral's negligence was an intervening cause of Suggs's pressure sores. Under District of Columbia law, "the initial wrongdoer can be held liable to the injured party for the whole loss, including aggravation of the injuries due to subsequent medical negligence" because, under traditional tort causation principles, "medical negligence aggravating the original injury is foreseeable within the scope of the risk created by the original tortious conduct." *District of Columbia v. Washington Hosp. Center*, 722 A.2d 332, 337 & n.5 (D.C. 1998) (internal quotation marks omitted); *see also Rieser v. District of Columbia*, 563 F.2d 462, 479 (D.C. Cir. 1977) ("If a negligent, intentional or even criminal intervening act or end result was reasonably foreseeable to the original actor, his liability will not ordinarily be superseded by that intervening act."). Given its history of care, Symbral's negligence was certainly foreseeable. The District's efforts to introduce an intervening cause fail.

* * *

The District also argues that the district court erred in instructing the jury on the District's probate lien against Suggs's estate. We agree. There was no evidence of that lien before the jury, and "[t]he law is well settled that it is error to instruct a jury on a state of facts not disclosed by the evidence." *Moore & Hill, Inc. Breuninger*, 34 App. D.C. 86, 89 (D.C. Cir. 1909). Harvey argues that the lien instruction was nevertheless appropriate, analogizing the instruction to a taxation instruction. But that analogy is inapposite. A taxation instruction informs the jury that "any damage award will not be subject to income taxation" in order to ameliorate the possibility that a jury would erroneously assume that an award would be subject to taxation and thus "'should be

increased substantially in order to be sure that the injured party is fully compensated.'" *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 626–27 (D.C. 1986) (quoting *Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490, 496 (1980)).  Here, however, alerting the jury to the existence of the lien created the very risk a taxation instruction is designed to ameliorate by encouraging the jury to increase its award in order to "fully compensate" Harvey.  We therefore conclude that it was error to instruct the jury on the District's lien.

Finally, the District argues that the district court erred in in denying the District's motion for a 50% contribution against the entire verdict.  We have reviewed that ruling and discern no error.

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed in part and reversed in part.  We vacate the damages and remand for reconsideration.