# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DELORES WALDO, <br><br> Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civil Action No. 19-cv-136 (TSC) |

## MEMORANDUM OPINION

Plaintiff Delores Waldo sued the District of Columbia and several Metropolitan Police Department ("MPD") officers pursuant to 42 U.S.C. § 1983 and District of Columbia law after her brother committed suicide while in MPD custody. The District moved for summary judgment and judgment on the pleadings, ECF No. 38. Having considered the record and the briefs, the court will GRANT the District's Motion.

## I.     BACKGROUND

On January 17, 2017, MPD officers responded to a call concerning an unlawful entry in Northwest D.C. D.C.'s Answers to Pl.'s Interr., ECF No. 38-4 at 2–3 ("Def.'s Answers"). James Anthony was arrested on the scene and brought to the MPD's Second District. *Id.*; Pl.'s Answers to Def.'s Interr., ECF No. 38-5 at 9 ("Pl.'s Answers"). Anthony "presented with erratic behavior during his arrest and while at the Second District Station," yet no medical providers were contacted nor was he closely monitored. Pl.'s Answers at 12. Instead, he was placed in a holding cell next to the intake area at 11:34 a.m. and hanged himself approximately ten minutes later. Statement of Undisputed Material Facts, ECF No. 38-3 ¶¶ 4–5. An officer eventually found Anthony hanging in his cell and began performing CPR, to no avail. Def.'s Answers at 4.

Plaintiff—Anthony's sister—filed this action in January 2019 against the District and John Doe MPD officers. Compl., ECF No. 1 ¶¶ 4–6. Defendants moved to dismiss, ECF No. 3, and Plaintiff moved to amend the Complaint, ECF No. 9. The court denied the motion to dismiss and granted in part Plaintiff's motion for leave to file an Amended Complaint. Order, ECF No. 14; *see* Am. Compl., ECF No. 9-2. Following the close of discovery, the District moved for judgment on the pleadings and summary judgment.

## II.   LEGAL STANDARD

### A.   Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Very few of" the D.C. Circuit's "precedents discuss Rule 12(c), in part because judgment on the pleadings is rare." *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 760 (D.C. Cir. 2019). The Court has made clear that "the party seeking judgment on the pleadings shoulders a heavy burden." *Id.*

On a motion for judgment on the pleadings, the court "accept[s] as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant," and affords "all reasonable inferences to the opponent's pleadings." *Id.* at 761 (citations omitted). And "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery." *Id.* (internal quotation marks and citation omitted).

### B.   Summary Judgment

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or

unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). The party seeking summary judgment bears the burden to provide evidence showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III.     MOTION FOR JUDGMENT ON THE PLEADINGS

The District seeks judgment on the pleadings on Plaintiff's individual capacity claims. Mem. in Supp. of Def. D.C.'s Mot. for J. on the Pleadings & for Summ. J., ECF No. 38-1 at 9 ("Motion"). In the operative Complaint, Plaintiff alleges that she "brings a claim against the Defendants *individually and* as the personal representative of the Estate of James Anthony." Am. Compl. ¶ 4 (emphasis added); *accord id.* ¶ 1. In her opposition, however, Plaintiff expressly agrees that she is not "entitled to judgment against the Defendant District of Columbia in her individual capacity." Mem. in Supp. of Pl.'s Mot. in Opp'n to Def. D.C.'s Mot. for J. on the Pleadings & for Summ. J., ECF No. 44-1 at 3 ("Opp'n"). Moreover, when asked which claims she asserts in her individual capacity against the District, she responded that "Plaintiff is making claims on behalf of the estate of Mr. James Anthony." Pl.'s Answers at 10–11.

"Generally, a court is justified in taking a litigant at [their] word when [they] explicitly concede[] one or more issues." *Fleming v. Medicare Freedom of Info. Grp.*, No. 15-cv-1135, 2019 WL 6330719, at *2 (D.D.C. Oct. 24, 2019) (citing cases). Consequently, the court will grant the District's motion for judgment on the pleadings on any claims brought by Plaintiff in her individual capacity.

## IV.     MOTION FOR SUMMARY JUDGMENT

### A.     Section 1983 Claims (Counts III and IV)

In Counts III and IV—the 42 U.S.C. § 1983 claims—Plaintiff alleges that Defendants denied Anthony medical care and protection in violation of the Fifth Amendment.  Am. Compl. ¶¶ 35–44.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  42 U.S.C. § 1983.  "A municipality or local government, such as the District, is a 'person' for section 1983 purposes."  *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)).  The District, however, is "not liable for injuries inflicted solely by their employees or agents; the government must be the 'moving force' behind the violation."  *Id.* (citing *Monell*, 436 U.S. at 694).  To establish the District as a "moving force" behind a constitutional violation, a plaintiff must show "that the District violated the Constitution and that the violation was the result of an official custom or policy."  *Id.* (citing *Monell*, 436 U.S. at 694).

An "official custom or policy" may exist when: (1) the District adopted a policy that "itself violates the Constitution"; or (2) a "policy maker" took an unconstitutional action; or (3) employees' unconstitutional actions "are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware"; or (4) the District "knew or should have known of a risk of constitutional violations, but showed 'deliberate indifference' to that risk by failing to act."  *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2001) (citation omitted; formatting modified).  Plaintiff claims the District is liable

under § 1983 based on a custom of unconstitutional actions and deliberate indifference theories. Am Compl. ¶¶ 36–37, 41–43.

To establish a pattern of similar constitutional violations, "a plaintiff must show that the municipality 'knowingly ignored a practice that was'" "persistent and widespread" such that it "amounted to 'standard operating procedure.'" *Hurd*, 997 F.3d at 338 (citations omitted). Deliberate indifference requires a showing that the municipality has "actual or constructive knowledge" that its employees "will probably violate constitutional rights" and fails to act. *Id.* at 339 (citation omitted). To show constructive knowledge, a plaintiff may point to a pattern of previous constitutional violations involving "materially similar legal implications so as to put the municipality on notice of the probability of future constitutional violations." *Id.* at 340. For example, the D.C. Circuit affirmed summary judgment to the plaintiff in *Harvey v. District of Columbia*, 798 F.3d 1042, 1053–54 (D.C. Cir. 2015), because the District had acknowledged in previous litigation that it had "fundamentally failed its obligation to disabled persons" and been found separately liable several times for violating the rights of intellectually disabled people in its custody, which put it on notice that its practices were violating those patients' rights, yet the District failed to "cure the problem." By contrast, in *Hurd*, 997 F.3d at 340, the D.C. Circuit held that plaintiff did not provide sufficient evidence to show the District had constructive knowledge because the past incidents he pointed to involved delayed inmate release practices, whereas his case involved incarceration policies where erroneously unserved sentences are discovered.

The District is entitled to summary judgment on both Count III and Count IV because Plaintiff has failed to identify any past incidents of denial of protection or denial of medical care that create a genuine dispute of material fact regarding a District custom or that put the District

on constructive notice that its employees would likely violate Anthony's constitutional rights. When Plaintiff's expert witness was asked at his deposition what he knew about MPD's policies, pattern and practice, training of staff, and whether he knew of any prior suicides at an MPD police precinct, he responded that he knew "[n]othing" about any of these topics. Dep. of Cameron K. Lindsay ("Lindsay Dep."), ECF No. 38-9 at 96:12–18, 142:20–143:10. Having alleged no past incidents, Plaintiff has not created a genuine issue of material fact regarding a "persistent and widespread" custom. *Hurd*, 997 F.3d at 338. Similarly, without any evidence of "actual or constructive knowledge," Plaintiff has demonstrated no genuine issue of material fact regarding deliberate indifference. *Id.* at 339.

Indeed, the closest indications of constructive knowledge in the record are statements about the D.C. Jail and other correctional facilities in Plaintiff's expert report. *See* Expert Report of Cameron K. Lindsay, ECF No. 44-4. First, Lindsay identified a 2013 report discussing "unacceptable practices the D.C. Jail engaged in that negatively affected the manner in which the Department handled suicides and the prevention thereof." *Id.* ¶ 70. Second, the report discussed the frequency of suicides in detention facilities, *id.* ¶¶ 67–68, and that "most jail suicides are accomplished by hanging," *id.* ¶ 75. But statistics about suicides in the D.C. Jail or other detention facilities do not alone create a genuine dispute of material fact regarding constructive knowledge that MPD officers would violate Anthony's constitutional rights at a police precinct by failing to protect him and provide him with medical care.

Jails and prisons to not appear to be proper comparators to the Second District holding facility. By nature, holding cells at MPD precincts are temporary, with individuals remaining in cells "usually less than 48 hours, pending their release, arraignment, adjudication, or transfer to another facility." Metropolitan Police Department, *Standard Operating Procedures: Holding*

*Facilities* at 1, SOP HOLDING FACILITIES.PDF (mpdconline.com).  Consequently, police precincts have specific policies for their holding facilities, separate from the D.C. Jail, other states, or the Bureau of Prisons, including separate policies for assessing suicide risk.  *See id.* at 8.  And Lindsay admitted that he was not aware of any suicides at *any* MPD police precinct. Lindsay Dep. at 96:12–18.  To be sure, the court does not hold that, as a matter of law, prior incidents at jails can never serve to put a municipality on notice of potential incidents at police precincts.  But Plaintiff has not articulated any reasons that incidents at jails and prisons could have put the District on constructive notice in this case.  Moreover, neither Plaintiff nor her expert proffered the circumstances of any of the past suicides at the D.C. Jail.  Without that information, a jury would be unable to determine whether those circumstances were "materially similar," *Harvey*, 798 F.3d at 1053, in order to return a verdict for Plaintiff, *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248).

Plaintiff argues that the District "should have known that any deliberate failure to closely monitor" Anthony after he presented with erratic behavior "was unlawful and violated his rights."  Opp'n at 6 (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)).  *Farmer*, however, is an Eighth Amendment case that did not involve municipal liability.  As the D.C. Circuit has explained, "the 'deliberate indifference' standard for establishing a municipal policy is distinct from that required to show an underlying constitutional violation" under the Eighth Amendment: the latter is subjective; the former objective.  *Harvey*, 798 F.3d at 1053.  To show objective constructive knowledge, Plaintiff must establish that the District engaged in previous constitutional violations with materially similar legal implications and similarly failed to act in this case.  *See id.*; *Hurd*, 997 F.3d at 340.  Plaintiff has not done so.

**B.      District Law Claims (Counts I, II, V)**

Plaintiff asserts District law claims for survival, wrongful death, and negligence in Counts I, II, and V, respectively. Am. Compl. ¶¶ 24–34, 45–48. By statute, District law provides a cause of action for rights of action that accrued prior to a decedent's death, known as survival. D.C. Code § 12-101. Here, Plaintiff's survival action is for negligence. Am. Compl. ¶ 28. The D.C. Code also provides a cause of action for "death of a person . . . caused by the wrongful act, neglect, or default of a person or corporation," known as wrongful death. D.C. Code § 16-2701. Plaintiff's final District law claim is a common-law negligence claim. Am. Compl. ¶¶ 45–48. Because each District law claim requires showing negligence, the court will first determine whether there is a genuine issue of material fact regarding the District's negligence.

*i.      Legal framework*

"The plaintiff in a negligence action bears the burden of proof on three issues: an applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Clark v. District of Columbia*, 708 A.2d 632, 634 (D.C. 1997) (citations omitted). The D.C. Court of Appeals has "repeatedly held that the standard of care owed by the District . . . to persons in its custody is a matter" that "requires expert testimony" demonstrating "proof of a national standard of care." *Id.* at 634–35.

To demonstrate a national standard of care, the plaintiff must identify an expert who can testify to a consensus of practice in the area at issue. For example, in *Messina v. District of Columbia*, 663 A.2d 535, 537–39 (D.C. 1995), the D.C. Court of Appeals held that plaintiff's expert evidence failed to establish a national standard of care regarding the quantity or quality of cushioning material the District needed to maintain under the monkey bars on a playground. The

expert pointed to playground equipment catalogues, which recommended a certain depth of cushioning material, a handbook, which recommended a specific cushioning guideline (the 200 G guideline) to prevent skull fractures, and tests he conducted indicating that ten to twelve inches of mulch would meet the 200 G guideline. *Id.* at 538–39. The court, however, reasoned that "there was no evidence that" the expert's conclusions "constituted any kind of national standard, that it had been promulgated, or was generally known" before the injury at issue in the suit, "or that the District should have been aware of its existence." *Id.* at 539. By contrast, in *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987), the D.C. Court of Appeals held that plaintiff's expert's testimony established a national standard of care for police training on interacting with people who may be in mental distress or under the influence of drugs because the expert testified that "police departments throughout the country commonly instruct officers" on how to handle such situations. The expert testified that "he knew of no metropolitan police department, other than the District's, which provided no training whatsoever" in this area, and named many cities across the country that do so, from Miami to Seattle. *Id.*

  ii.  *There is no genuine dispute of material fact regarding negligence*

  Plaintiff has not established a genuine dispute of material fact regarding negligence because her expert has not identified a national standard of care. Lindsay's testimony showed that he is not well-informed regarding standards of care for police precincts. For example, when asked which jurisdictions screen for mental illness, suicidal ideation, intoxication, or withdrawal on intake, Lindsay said "I don't know of any, but there would be no reason for me to know because I've never worked on a case like this before" where "someone killed themselves in a police precinct." Lindsay Dep. at 99:18–100:6; *accord id.* at 100:13–15 (Lindsay responding with "I don't know" when asked the source of intake standards for police precincts). And when

asked if he was "aware of any standards that speak to whether police departments are required to have mental health professionals on staff at their holding facilities," Lindsay answered "I am not." Dep. of Cameron Lindsay, ECF No. 47-2 at 118:20–119:2. Lindsay repeatedly pivoted to his experience with prisons and jails when asked about practices in police precincts, *e.g.*, Lindsay Dep. at 100:6–12, but Plaintiff has not established that police precincts are interchangeable with jails and prisons for the purpose of establishing the standard of care.

Plaintiff argues that Lindsay established a nationwide standard of care by pointing to the American Correctional Association ("ACA") and National Commission on Correctional Health Care ("NCCHC") standards. Opp'n at 6–9. Both sets of standards, however, are considered "voluntary"—not "mandatory." Lindsay Dep. at 82:3–4, 116:14–17. Generally, "professional guidelines or standards" are "appropriate methodology for experts to use when opining on an applicable standard of care." *Girdler v. United States*, 923 F. Supp. 2d 167, 191 (D.D.C. 2013). But, when using voluntary guidelines as a reference for standard of care, the court must exercise "caution" to "ensure that they are clearly relevant and applicable to the circumstances presented." *Id.* That practice makes good sense, since "voluntary guidelines do not amount to legal requirements." *Id.*

Exercising that caution, the court finds neither the ACA nor NCCHC guidelines applicable here. For one thing, both are aimed at jails and prisons—not police precincts. *See supra* Section IV.A. For another, Lindsay was not able to identify any jurisdiction that has adopted the ACA standards, other than the Bureau of Prisons, Lindsay Dep. at 82:6–83:6, and he did not know of any jurisdiction that adheres to the NCCHC standards, other than the Delaware County Prison, where he was once the warden, *id.* at 116:18–117:8. Lindsay also noted that the "vast majority" of jurisdictions are not accredited by NCCHC and do not require ACA

accreditation. *Id.* at 82:15–17, 117:3–5. Indeed, Lindsay admitted that he did not know if the NCCHC standards applied to police precincts at all. *Id.* at 117:13–17. Referencing the ACA and NCCHC standards is therefore insufficient to establish a national standard of care at police precincts.

### iii. *Plaintiff may not amend her expert report*

In her opposition, Plaintiff seeks leave to amend Lindsay's report if the court deems it deficient. Opp'n at 9–10. The court will deny that request. Plaintiff has not shown that amending her expert report would not be futile. She gives no examples or detail regarding the kinds of amendments to Lindsay's expert report that could cure the deficiencies in his testimony. Nor are such amendments easily identifiable. As the court has already explained, Lindsay's expertise and experience are with jails and prisons—not police precincts—and he was unable to articulate to what extent jails and prisons might be appropriate comparators for police precincts. To cure the deficiencies in Lindsay's expert report, Plaintiff would likely need to designate an entirely new expert, which she has not sought leave to do.

Moreover, Federal Rule of Evidence 26(e), which provides for supplementing expert disclosures, "does not permit parties to file supplemental reports whenever they believe such reports would be 'desirable' or 'necessary' to their case." *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 34 (D.D.C. 2013). Rather, supplementing expert disclosures is typically reserved for situations in which new information affecting the expert report comes to light after the report is filed. *See id.* at 34–35; Fed. R. Evid. 26(e). Plaintiff has not indicated that she wishes to supplement Lindsay's expert report with new information; only that she wishes to cure legal deficiencies in the report.

## V. CONCLUSION

For the foregoing reasons, the court will GRANT Defendants' Motion for Summary Judgment and Judgment on the Pleadings, ECF No. 38. An Order will accompany this Memorandum Opinion.

Date: July 1, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge